IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-mj-24 |
| | ) | |
| JOSEPH HASSAN FARROKH, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Walter T. Johnson, Jr., after being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Secret Service ("USSS"), and have been so employed for over 17 years. I have served as a Task Force Officer in the Federal Bureau of Investigation's Washington Field Office, Joint Terrorism Task Force for over a year. In July 2014, I was assigned to investigate global terrorist organizations operating against U.S. interests in Africa. I have participated in multiple terrorism-related and criminal investigations, including cases involving individuals providing financial support to terrorist organizations, attempting to travel to join terrorist organizations, and conspiring to communicate threats and solicit murder.

2. This affidavit is submitted in support of a criminal complaint charging Joseph Hassan Farrokh with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3. The information contained in this affidavit is based on my personal knowledge and observations made during the course of this investigation, personal review of records, documents, and other physical evidence obtained during this investigation, including recorded telephone, audio, and in-person communications and information provided to me by FBI Agents

and other government personnel with knowledge relating to this investigation, particularly including the FBI sources of information identified below as "CHS #1," "CHS #2," and CHS #3.

4. This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to lawful court orders or the consent of at least one party to the communication. The majority of these recorded communications were in English, with a small percentage in Arabic. Since this affidavit is submitted for the limited purpose of supporting the criminal complaint, I have not included every fact known to me concerning this investigation. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that a communication was made on a certain date, I mean that the communication was made "on or about" that date.

I.   ISIL's DESIGNATION AS A FOREIGN TERRORIST ORGANIZATION

5. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has

never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history. To date, ISIL remains a designated FTO. In an audio recording publicly released on or around June 29, 2014, ISIL announced a formal change of its name to the "Islamic State." The terrorist organization ISIL has spread its violent message to individuals who identify with ISIL beyond the borders of Iraq and Syria.

## II. FACTS ESTABLISHING PROBABLE CAUSE

6. Joseph Hassan Farrokh is a 28-year old United States citizen who was born in Pennsylvania. Farrokh has resided in Woodbridge, Virginia, since July 2015.

7. Mahmoud Amin Mohamed Elhassan is a 25-year old resident of Woodbridge, Virginia. Elhassan is originally from Sudan. He became a legal permanent resident of the United States in 2012.

8. The FBI confirmed that on October 2, 2015, in a conversation about events in Syria between Farrokh and Elhassan, Farrokh said that he had no patience and that he wanted to go right away and "chop their heads." When Elhassan characterized Farrokh's attitude as that of an "extremist," Farrokh said that he just belongs on the battlefield and would rather go by himself.

9. An individual to whom I will refer here as "CHS #3" is a confidential human source who has provided information to the FBI since 2012. CHS #3 has been convicted of criminal offenses, but received a sentence reduction for his cooperation. CHS #3 has received over $10,000 from the FBI in the course of his cooperation. His reporting has been corroborated by electronic and other means, and he has provided no information in the course of his cooperation that has been determined to be untrue. CHS #3 is personally acquainted with both Farrokh and Elhassan.

10. CHS #3 reported that he first met Farrokh in August 2015. It was Elhassan who introduced CHS #3 to Farrokh. Elhassan believed CHS #3 maintained connections to individuals engaged in jihad outside the United States. CHS #3 said that he was with Elhassan and Farrokh together at this August 2015 meeting. The three of them met again on October 17, 2015. While they were all together, Farrokh asked CHS #3 for help in getting to Syria while in the presence of Elhassan. CHS #3 said that he would try to find someone who could help get Farrokh to "Dawlah." As noted in paragraph 5 above, and consistent with my knowledge of the designated foreign terrorist group ISIL, I know that when Farrokh and Elhassan discuss "Dawlah" they mean ISIL.

11. CHS #3 reported that, in November 2015, CHS #3 told Elhassan that CHS #3 had a message for Farrokh, which Elhassan understood to be an update from the "Dawlah" facilitator who Farrokh asked CHS #3 to contact. CHS #3 then asked Elhassan to pass that message to Farrokh and to have Farrokh meet CHS #3, as CHS #3 did not have Farrokh's contact information. The FBI confirmed that on November 1, 2015, Elhassan notified Farrokh that CHS #3 had information for Farrokh.

12. The FBI confirmed a conversation on October 31, 2015 between Farrokh's mother and Farrokh wherein Farrokh's mother told Farrokh he sounded aggressive; in response, Farrokh told his mother that he asked Allah to increase his torment on the Christians and to make their faces burn in hell's fire; he asked Allah to destroy the Christians because they are the enemies of Allah and the enemies of humanity.

13. On November 13, 2015, CHS #1 telephoned Farrokh and told Farrokh that CHS #3 had vouched for Farrokh. Farrokh and CHS #1 agreed to meet on the weekend of November

20, 2015. Farrokh understood CHS #1 to be an ISIL facilitator who could assist him in joining ISIL overseas.

14. On November 20, 2015, CHS #1 telephoned Farrokh and set up a meeting for later that day. CHS #1 told Farrokh that he would bring a trusted "brother," hereinafter referred to as "CHS #2." Through a text message, Farrokh sent CHS #1 the address of a restaurant in Springfield, Virginia, for the meeting.

15. At about 3:00 p.m., on November 20, 2015, Farrokh met CHS #1 and CHS #2 at a parking lot in Springfield, Virginia, as planned. All three men sat in CHS #1's car. The meeting was recorded by the FBI. Farrokh expressed concern about trusting CHS #1 and CHS #2, and said that he did not want to go to jail for 15 years. CHS #1 and CHS #2 told Farrokh that he could leave if he did not feel comfortable, and yet they would still remain brothers; they said that Farrokh did not have to talk if he did not feel comfortable.

16. Farrokh suggested that they swear an oath that anyone working with the kuffar would suffer the curse of Allah (I know that "kuffar" is a term that can be used to refer to non-Muslims). Farrokh swore that oath; he said that he was smiling during the oath because if he goes to jail he would feel good because it was for Allah. Farrokh understood that he was meeting with CHS#1 because he was a facilitator for ISIL and would assist Farrokh in gaining membership to ISIL in Syria. Farrokh understood CHS#2 to be CHS#1's "trusted brother" also aligned with ISIL's cause.

17. Farrokh said that no one could prove to him anything that the "Dawlah" has done is against Islam. Farrokh asked what would be his chances of successfully getting into Syria. CHS #1 and CHS #2 told him that now the route is through Jordan because it was now hard to get into Syria through Turkey.

5

18. Farrokh asked how soon he could go to Syria if he wanted to go. CHS #1 gave Farrokh a time frame of between one to two months. CHS #1 told Farrokh that they would need copies of his passport and driver's license to pass to brothers at the border to ensure that Farrokh was trusted and not being watched by law enforcement. Farrokh responded that would be no problem. CHS #2 asked Farrokh what group Farrokh wanted to join. Farrokh answered; "Dawlah," of course," and said that "now I'm saying something I can go to jail for." Farrokh said that he feels like he was made to be a mujahideen and that he has asked Allah every day to make him a shaheed (an Arabic term meaning holy martyr). Farrokh said that he wanted to kill for Allah's sake and be killed for Allah's sake, and that he asks that of Allah every day.

19. Farrokh asked CHS #1 and CHS #2, "So, what's the next step?" CHS #1 said that Farrokh would need to do Bay'ah (based on my training and experience, I know that doing "Bay'ah" essentially consists of declaring an oath of allegiance). CHS #1 said that Farrokh would not do Bay'ah that day, but that he (Farrokh) should go home and think about it and then, if Farrokh wanted to meet the next day, he could do it then. Farrokh asked CHS #1 whether he (Farrokh) would have to do something in America if he did Bay'ah. CHS #1 said that Farrokh would not have to do anything in America, but that ultimately it would be Farrokh's decision. As they departed, Farrokh said that he has been asking Allah to help him get to Syria for a year now, and that they made him very happy.

20. On November 21, 2015, following an exchange between CHS #1 and Farrokh, the three men met again in the afternoon in CHS #1's vehicle in a Springfield, Virginia parking lot. The meeting was recorded by the FBI. CHS #2 said that it was up to Farrokh if Farrokh did not want to go to Syria, or was uncomfortable with dying as a martyr in jihad, but that he and CHS #1 would still be brothers in Allah with Farrokh. In response, Farrokh said that he was really

happy when he left the meeting the previous day because this was what he had been waiting for. He said that in the past he had other ways to get to Syria but they weren't secure, and that he needed a connection because he didn't want to get arrested.

21. CHS #1 instructed Farrokh to print a copy of an application for a visa to enter Jordan from the internet, fill it out by hand, and send a picture of it to CHS #1 to start their internal vetting process to make sure they could trust Farrokh and that Farrokh was not being monitored by law enforcement. Farrokh was hesitant at first, saying that he was worried that he would be arrested if he gave them his passport and other documentation that would show that he had the intention to go. Farrokh later provided a copy of his U.S. passport, and stated he would send to CHS #1 a picture of his Virginia driver's license.

22. CHS #1 and CHS #2 told Farrokh that it would be necessary for Farrokh to prove his commitment and become a member of the mujahideen by giving his Bay'ah. Farrokh said that he knew that he would need to give his Bay'ah once he got overseas, but did not understand why he needed to give it here, as it was something that the kuffar could use against him, and could result in him going to prison for 15 years. CHS #1 said that, by giving the Bay'ah here, Farrokh would be saying that he is now with "Dawlah." CHS #2 said that he (CHS #2) was a fighter, and he (CHS #2) was going to go, and if Farrokh wanted to join him he would be his brother, but that Farrokh has a heart, has a brain, and can think for himself. CHS #2 told Farrokh to just tell them if he (Farrokh) wasn't ready and that doing so would be ok. CHS #1 told Farrokh that it was fine if Farrokh wanted to keep the copy of his passport with him. Farrokh ultimately stated "Yeah, so let's do it."

23. CHS #1 then explained each line of the Bay'ah in English, and specified that the Bay'ah was to the Caliph, "Abu Bakr," but that Abu Bakr's true name was Amir al Muhaimin the

Khalifa Sheikh Abdullah Ibrahim Bin Alwad Bin Ibrahim al-Kharachi. CHS #1 asked Farrokh "you are ready brother?" Farrokh responded "yes." Farrokh then repeated each line of the Bay'ah in Arabic, after CHS #1 read it to him.

24. After their meeting on November 21, 2015, CHS #1 thanked Farrokh for meeting with him. Farrokh responded through a text message, "I love you for the sake of Allah." Farrokh also texted a photo of his Virginia driver's license to CHS #1.

25. On November 24 and 25, 2015, Farrokh and CHS #1 conferred regarding the application for a visa to enter Jordan. On November 25, 2015, CHS #1 received from Farrokh a picture of Farrokh's completed Jordanian visa application. On December 3, 2015, they exchanged texts regarding meeting together later that month.

26. The FBI confirmed that on December 9, 2015, Farrokh told Elhassan that, on December 3, 2015, he (Farrokh) put in his two-week notice at work.

27. On December 15, 2015, CHS #1 met Farrokh in Baileys Crossroads, Virginia. The meeting was recorded by the FBI. Farrokh presented CHS #1 with his Jordanian visa application. CHS #1 told Farrokh that Farrokh was cleared by the "Dawlah" to travel to Jordan where he would be met by an individual named "Abu Mohammed" (a fictitious Jordanian contact). CHS #1 told Farrokh that he would not just be given a gun and pointed in the direction to go fight; CHS #1 said that, before being sent into Syria, Farrokh would need to spend about 30 days to learn the culture, some language, and receive weapons training.

28. Farrokh asked CHS #1 if Farrokh could limit his time in training before going to fight with the "Dawlah" in Syria because he feared arrest in Jordan if his family realized that he had left to join "Dawlah." Farrokh said that he told his family that he was traveling to Saudi Arabia to study and would return, but that his family might get suspicious if he does not return.

29. Farrokh told CHS #1 that he would start researching flights, possibly out of Richmond, Virginia to avoid what he believes to be stricter law enforcement scrutiny at large airports. CHS #1 told Farrokh to travel between January 15th and January 20th, 2016 and preferably on a holiday if there is one within that time frame. Farrokh told CHS #1 that he would send CHS #1 his flight information soon so that CHS #1 could inform "Abu Mohammed" and CHS #2 of Farrokh's arrival, so that they could greet Farrokh at the airport in Jordan.

30. Farrokh expressed concern that airport security or TSA would search his phone. Farrokh told CHS #1 that he would trim and style his beard to appear more American. Farrokh said that he had not been training and working out because he felt that doing so would raise suspicions; Farrokh said, however, that "Allah made me for jihad."

31. Farrokh said that he was not interested in coming back to the US, but asked if his wife and family could eventually join him in Syria. He said that he was very excited and that he gives praise to Allah every time he sees the "black flag" (which I believe is a reference to the flag of ISIL).

32. CHS #1 told Farrokh that if, before leaving the U.S., Farrokh thought of anything that would benefit him while he is fighting with "Dawlah," then Farrokh could send it to an address provided by CHS #1 so that a trusted brother could send it overseas in a shipment that would not be tied to Farrokh. Farrokh said that CHS #1's idea was a good one. When CHS #1 followed-up with Farrokh and asked if he needed to send anything overseas in advance of his trip, Farrokh declined and said he would take everything with him when he travelled.

33. On December 19, 2015, Farrokh exchanged text messages with CHS #1 about Farrokh's travel plans. Farrokh asked CHS #1's opinion of Farrokh's plan to minimize suspicion about his travel by buying a round trip plane ticket, and reserving a hotel room in Jordan that

could be cancelled upon his arrival in Jordan. CHS #1 told Farrokh that Farrokh should do whatever made him comfortable. Farrokh said that he was not familiar with smaller airports in the area, and asked CHS #1's opinion of Farrokh flying out of Reagan Airport. CHS #1 told Farrokh that smaller airports were better. Farrokh wrote that he would let CHS #1 know once he purchased a ticket.

34. On December 21, 2015, Farrokh texted CHS #1 that Farrokh had purchased his airplane ticket for Jordan, departing January 15, 2016 from Richmond, Virginia, and connecting in Chicago, Illinois. In fact, as described below, Farrokh attempted to depart from the Richmond International Airport to begin the first leg of his journey to Syria, intending to fight for ISIL.

35. On January 1, 2016, the FBI taped a conversation between Elhassan and CHS #3. In that conversation, Elhassan admitted that, from discussions and private communications with Farrokh, Elhassan knew of Farrokh's plans to travel to Syria to join ISIL. Elhassan made statements acknowledging that Farrokh was falsely telling his family that he intended to travel to Saudi Arabia to study. Elhassan told CHS #3 that Farrokh was close to leaving for ISIL, and that Farrokh was not going through Turkey, but through the same route he talked about before with CHS #3 (which I believe refers to Jordan). Elhassan said that he did not want to see Farrokh go to prison; Elhassan said that Farrokh had sent Elhassan an article about a sting by police in Rochester, New York, against a man who wanted to join the Dawlah. Elhassan asked CHS #3 if Elhassan could trust "the brother" (a reference to CHS #1) that CHS #3 put in touch with Farrokh.

36. The FBI has confirmed that Elhassan has repeatedly cautioned Farrokh to watch what he says openly about ISIL on the phone. CHS #3 reported that, on January 1, 2016, Elhassan expressed concern that law enforcement authorities might be listening to his

conversations.

37. On January 8, 2016, Farrokh met with CHS #2 in CHS #2's car in Falls Church, Virginia. The meeting was recorded by the FBI. In the course of the meeting, CHS #2 said that, once Farrokh reached the Islamic State, Farrokh would receive training, including training on weapons, and then go to the front lines. CHS #2 said that, as an American, Farrokh should know that United States Special Forces were fighting the Islamic State in Syria. In response, Farrokh said that "honestly, this is the best." Farrokh said that he wanted to die a martyr.

38. At approximately 7:55 a.m. on January 15, 2016, the day of departure for Farrokh's previously scheduled flight to Jordan, Farrokh left his residence in Woodbridge, Virginia, in a red taxicab driven by Elhassan. Farrokh was observed with two bags. Elhassan drove southbound on Interstate 95 towards Richmond. Upon reaching the vicinity of the Richmond International Airport, Farrokh and Elhassan stopped at a commercial and retail area approximately one mile from the airport. Farrokh and Elhassan stayed together at this commercial area for approximately two hours. At approximately noon, a yellow taxicab arrived and Farrokh entered this taxicab which drove him the approximate one mile to the Richmond International airport. Elhassan departed the commercial area near the airport and drove northbound on Interstate 95. He was surveilled by law enforcement agents as he proceeded on Interstate 95.

39. Farrokh entered the airport terminal and proceeded to check-in for his flight to Jordan via Chicago. Upon checking in, Farrokh cleared through the departure security area carrying two bags. Upon clearing the security checkpoint, Farrokh proceeded to walk to his departure gate. Farrokh was arrested by the FBI as he was approaching his departure gate.

40. Subsequent to Farrokh's arrest, FBI agents approached Elhassan that afternoon at a location in Woodbridge, Virginia, where he voluntarily consented to an interview. During the course of the interview, Elhassan verbally acknowledged to the interviewing agents more than once that he knew it was illegal to knowingly lie to federal agents. He then proceeded to make a number of false statements in response to the agents' questions. Elhassan admitted knowing Farrokh and stated that he had first met Farrokh approximately two months ago and that the two would occasionally talk by telephone. When asked when he had last seen Farrokh, Elhassan told the agents that it had been around 11:30 a.m. that day in the Woodbridge, Virginia area. He further stated that Farrokh was going to the airport to fly to California to attend the funeral of a friend and that Farrokh had told him that he would be gone for two weeks. When asked which airport Farrokh was departing from, Elhassan initially hesitated then said that Farrokh was flying out of Dulles airport. At the conclusion of the interview, Elhassan was placed under arrest.

## CONCLUSION

41. Based on the foregoing, there is probable cause to believe that, from on or about November 20, 2015, and continuing to January 15, 2016, in Prince William County and elsewhere in the Eastern District of Virginia, Joseph Hassan Farrokh knowingly attempted to provide material support and resources, to wit: personnel to include himself, to a foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B.

Walter T. Johnson, Jr.
Special Agent, United States Secret Service

Subscribed to and sworn before me on this 16th day of January 2016.

                                                    /s/
                                      John F. Anderson
~~United States Magistrate Judge~~
JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE