IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:16cr00020 (AJT) |
| ) | |
| JOSEPH HASSAN FARROKH ) | |

**<u>UNITED STATES' MEMORANDUM IN AID OF SENTENCING</u>**

The defendant became fixated in 2015 on serving the Islamic State, a brutal terrorist organization committed to the slaughter of the *kuffar* (non-Muslims)[1]. The Islamic State widely promotes its unique brand of savagery and perverted ideology through conventional media sources and modern social media outlets. The terrorist organization has publicly distributed its videotaped beheadings of American journalists and humanitarian aid workers. The terrorist organization torched a foreign soldier held captive in a cage and distributed the video of his brutal death. The Islamic State promotes and engages in the widespread rape and enslavement of women belonging to a religious minority in Iraq and Syria. The Islamic State slaughters thousands of males within the same religious minority. The terrorist organization's savagery does not respect any

---

[1] The Islamic State is led by Abu Bakr al-Baghdadi. Mohamad al-Adnani serves as the terrorist organization's chief spokesman and as a top advisor to Baghdadi. Baghdadi was declared a specially designated global terrorist by the Department of State on October 4, 2011. In a rare public address on July 5, 2014, within a mosque in Mosul, Iraq, Baghdadi declared the Islamic State a caliphate and he anointed himself the Caliph, or leader, of the organization. The objective of the terrorist organization is the forcible acquisition of land for the stated goal of creating an Islamic State without recognizing any national boundaries. The terrorist organization seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community. On September 22, 2014, the organization released an audiotape of a speech by Adnani in which he states, on behalf of the FTO, " … if you can kill a disbelieving America or European … then rely upon Allah and kill him in any manner or way however it may be. Smash his head with a rock, or slaughter him with a knife, or run him over with your car, or throw him down from a high place, or choke him, or poison him." Adnani concludes by stating "you have realized the threat of the Islamic State."

boundaries, moral or geographic, and the organization continues to promote and inspire violent acts, including acts committed within the United States. The defendant found this organization appealing.

Joseph Farrokh and his co-defendant spoke openly with each other in 2015 about supporting the Islamic State and supporting violent jihad. The co-defendants watched videos online that glorified terrorism in support of Islam, such as videos depicting sermons by Anwar Awlaki. The co-defendants discussed the contents of the videos and supported the ideology promoted in the videos. Farrokh learned from his co-defendant about the sermons of a radical Sudanese cleric who supported the Islamic State.

In the late summer of 2015, Farrokh talked more seriously with his co-defendant about traveling overseas and joining the Islamic State. On October 2, 2015, in a conversation about events in Syria, the defendant said that he had no patience and that he wanted to go right away and "chop their heads."

On November 20, 2015, Farrokh met an FBI source (CHS #1) in Springfield, Virginia. CHS #1 introduced Farrokh to another individual ("CHS #2"). During the meeting, Farrokh, CHS #1, and CHS #2 discussed a plan for Farrokh to travel to Syria to join the Islamic State. Farrokh expressed concern about trusting CHS #1 and CHS #2, commenting that he did not want to go to jail for 15 years. CHS #1 and CHS #2 told Farrokh that he could leave if he did not feel comfortable, and yet they would still remain brothers; they said that Farrokh did not have to talk if he did not feel comfortable.

Farrokh suggested that they swear an oath that anyone working with the *kuffar* would suffer the curse of Allah. Farrokh swore that oath; he said that he was smiling

2

during the oath because if he goes to jail as a result of the meeting he would feel good because it was for Allah.

Farrokh said that no one could prove to him that anything the Islamic State has done is against Islam. Farrokh asked about his chances of successfully getting into Syria. Farrokh was told that the best route was through Jordan. When asked what group he wanted to join, Farrokh referred to the Islamic State by answering "Dawlah, of course," and said that "now I'm saying something I can go to jail for."

Farrokh said that he feels like he was made to be a *mujahideen* and that he has asked Allah every day to make him a *shaheed* (an Arabic term meaning holy martyr). Farrokh said that he wanted to kill for Allah's sake and be killed for Allah's sake, and that he asks that of Allah every day. Farrokh said that he had been asking Allah to help him get to Syria for a year now, and that meeting CHS #1 and CHS #2 made him very happy.

In the car, CHS #1 and CHS #2 told Farrokh that he would have to swear allegiance ("make bay'ah") to the leader of the Islamic State in order for them to help him get to the Islamic State. When Farrokh asked whether he would have to do something in America if he swore allegiance to the leader of the Islamic State, CHS #1 told him that Farrokh would not have to do anything in America, but that ultimately it would be Farrokh's decision.

On December 9, 2015, Farrokh told his co-defendant that he had recently put in his two-week notice at work in preparation for his travel to Syria in January 2016. Farrokh researched flights, possibly out of Richmond, Virginia, to avoid what Farrokh believed to be stricter law enforcement scrutiny at larger airports. Farrokh told CHS #1 that he would send CHS #1 his flight information soon so that CHS #1 could assist Farrokh with his

3

overseas travel plans. On or about December 21, 2015, Farrokh finalized his travel plans by purchasing his airplane ticket for Jordan, departing January 15, 2016 from Richmond, Virginia, and connecting in Chicago, Illinois. The defendant told his family that he intended to travel to Saudi Arabia in order to study.

On January 8, 2016, Farrokh met with CHS #2 in Falls Church, Virginia. In the course of the meeting, CHS #2 said that once Farrokh reached the Islamic State, Farrokh would receive training, including training on weapons, and then go to the front lines. CHS #2 said that, as an American, Farrokh should know that United States Special Forces were fighting the Islamic State in Syria. In response, Farrokh said that "honestly, this is the best." Farrokh said that he wanted to die a martyr.

Shortly before 8:00 a.m., on January 15, 2016, Farrokh left his residence in Woodbridge, Virginia, carrying two travel bags, and entered a taxi driven by the co-defendant. At a bathroom in Dale City, Farrokh shaved his beard in an effort to avoid scrutiny when he reached the airport. After several other efforts at avoiding scrutiny, Farrokh entered the airport terminal and proceeded to check-in for his flight to Jordan, *via* Chicago. Upon checking in, Farrokh cleared through the departure security area carrying two bags. Farrokh was arrested by the FBI as he was approaching his departure gate.

**I.      The Applicable Guidelines Range Is Correctly Calculated at 292 to 365 Months, with a Restricted Statutory Cap at 240 months.**

As this Court is aware, after *United States v. Booker*, 543 U.S. 220 (2005), the district court must engage in a multi-step process in sentencing a defendant. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range. *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). In doing so, the Court must make factual

findings, supported by a preponderance of the evidence, to support any pertinent guidelines enhancements. *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009); *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).

That the Sentencing Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Abu Ali*, 528 F.3d 210, 260 (4th Cir. 2008). Indeed, given the Sentencing Commission's important institutional role and expertise, the recommended guidelines range typically will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)); *Unites States v. Lymas*, -- F.3d --, 2015 WL 1219553, at *4 (4th Cir. Mar. 18, 2015). The district court must therefore "consider the guideline range applicable to the defendant and pertinent policy statements of the Sentencing Commission." *United States v. Perez-Pena*, 453 F.3d 236, 241 (4th Cir. 2006); *see also United States v. Hughes*, 401 F.3d 540, 548 (4th Cir. 2005) ("In the wake of *Booker* . . . a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" (quoting *Booker*, 543 U.S. at 264)). And, if the district court imposes a sentence outside the guideline range, the court must explain its reasons for the variance as required by 18 U.S.C. § 3553(c)(2). *Id.*; *see also United States v. Carter*, 564 F.3d 325, 328 (4th

5

Cir. 2009); *Abu Ali*, 528 F.3d at 260 ("If the sentencing court believes 'an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" (quoting *Kimbrough*, 552 U.S. at 597)); *United States v. Moreland*, 437 F.3d 424, 434 (4th Cir. 2006) ("The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be.").

The United States has reviewed the Presentence Investigation Report (PSR) and we have no additions, corrections, or objections to the PSR. The PSR properly calculates a base offense level of 35 at criminal history category VI, based upon the guidelines requirement that the terrorism enhancement shall be applied and the automatic calculation of criminal history category VI. In paragraph 61 of the PSR, the probation officer makes the reasonable point that if the court finds that category VI substantially over-represents the defendant's criminal history, then the criminal history category can be calculated at II, which corresponds with the defendant's criminal history category without the mandatory category VI required by the terrorism enhancement. This places the defendant in an advisory guidelines range of 188-235 months. The government agrees that the 3553(a) factors support a sentence within this range.

## II.     The 18 U.S.C. § 3553(a) Sentencing Factors Support a Substantial Sentence

Under 18 U.S.C. § 3551, a defendant must be sentenced "in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case." This mandate is repeated in the first sentence of § 3553(a), which provides: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in

6

paragraph (2) of this subsection." This section then states that in determining a particular sentence, a sentencing court must consider certain enumerated factors. Thus, § 3553(a) serves two functions:

> First, it prescribes that every sentence comply with the four announced *purposes* for sentencing. Second, it lists seven *factors* that a court must consider in determining a particular sentence, and included as one of the factors is the list of announced purposes for sentencing in § 3553(a)(2).
>
> \* \* \* \*
>
> The proper application of § 3553(a) therefore requires a sentencing court to focus on the four *purposes* of sentencing, as applicable in a particular case, and to consider, in determining a sentence that achieves those purposes, the seven *factors* listed in § 3553(a)(1)-(7).

*United States v. Shortt*, 485 F.3d 243, 247-48 (4th Cir. 2007) (emphasis in original). These factors, however, can themselves overlap. *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006) (comparing, for example, promoting respect for the law under § 3553(a)(2)(A) and affording adequate deterrence under § 3553(a)(2)(B)).

In this case, the § 3553(a) factors are consistent with a substantial sentence. Of particular significance are (1) the nature and circumstance of the offense and the need for the sentence imposed to reflect the seriousness of the offense, (2) the history and characteristics of the defendant, and (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct.

    **A.    The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

The nature and circumstances of the offenses for which the defendant has been convicted warrants a substantial sentence for the defendant. The savage nature of the terrorist organization is set forth in the introduction. The ease with which the defendant gravitated towards this brutal

7

terrorist organization is alarming. The defendant stated he wanted to die a martyr. When told that he would be fighting against U.S. Military Special Forces, he replied "honestly, this is best." The defendant had ample opportunity throughout 2015 to change course and lead a responsible and law-abiding life. He chose not to do that. Rather, he thoughtfully mapped out his plan to leave his family and his country behind in order to fight with a designated terrorist organization.

A substantial sentence will reflect society's contempt for the defendant's conduct and for the potential harm caused to the people of this community.

### B. The History and Characteristics of the Defendant

The defendant has no one to blame but himself for his situation. The defendant also deserves credit for accepting responsibility for his actions. The government is hopeful that his acceptance of responsibility is the start of a long period of rehabilitation. However, the conduct engaged in here was undertaken by a man from a relatively stable and loving family. This court encounters many criminal defendants who have few life options. This defendant had options and he chose poorly. Despite an intact family structure, a wife and an expectant child, the defendant chose a different a path. He chose to break the law.

### C. The Need for the Sentence Imposed to Afford Adequate Deterrence

In addition, imposing a substantial prison sentence in this case is necessary to promote respect for the law and afford adequate deterrence. The importance of this factor cannot be overstated. A substantial sentence in this case would send an appropriate and much needed message to all persons harboring any notion that serving, joining or aiding the Islamic State in any manner is worthwhile. It is abhorrent conduct. Strong punishments for this conduct send the appropriate message to others, *i.e.*, that providing support to terrorist organizations will be pursued

aggressively, and those who violate the law in this manner will be tried, convicted, and punished accordingly.

**D.      Unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6))**

The factor addressing the need to avoid unwarranted sentence disparities among defendants with similar records, who have been found guilty of similar conduct is difficult to address in this case.   Simply put, each material support for terrorism case has unique features. Nonetheless, three cases are instructive:

    1.   *United States v. Ali Shukri Amin, 1:15CR00164-CMH*
        *(sentenced to 136 months on August 28, 2015)*

Amin is the most recent 2339B material support defendant sentenced in the Eastern District of Virginia.   On August 28, 2015, Judge Hilton sentenced Amin to 136 months in prison, reflecting a meaningful departure from the low end of the restricted guidelines range of 180 months for that case.   Like this defendant, Amin accepted responsibility for his crime and pled guilty.   However, Amin committed his conduct as a juvenile.   He was sentenced near his 18th birthday.   This defendant was a mature man of 27 when he committed his criminal conduct. Again, parsing the relative conduct among material support defendants is difficult, but Amin was a facilitator – he recruited someone else to join the ISIL cause and facilitated this person's travel to Iraq and Syria – whereas this defendant was an actual traveler committed to joining the organization himself for the purpose of becoming a fighter.   Amin was a more prolific user of the internet to provide his support, but this defendant expressed himself more violently ("chop their heads.")

2. *United States v. Alaa Saadeh, District of New Jersey*
   *(sentenced to 180 months on May 10, 2016)*

Saadeh pled guilty to conspiring with his brother to travel overseas to join the Islamic State. Saadeh was arrested on June 29, 2015 prior to leaving the United States to join the Islamic State. The defendant's conduct is comparable to Saadeh.

3. *United States v. Sinh Vinh Ngo Nguyen, a/k/a Hasan Ubu Omar Ghannoum, Central District of California*
   *(sentenced to 156 months in prison on June 30, 2014.)*

Nguyen was arrested boarding a bus destined for Mexico where he was planning on departing on a flight to Pakistan where he intended to help al-Qai'da with weapons training. The defendant also admitted travelling to Syria in 2012 to join anti-Assad forces.

4. *Other*

Other similar sentences imposed range from four years, or six years, to in excess of 20 years if the offense conduct involved weapons or multiple offenses.

## Conclusion

The defendant's state of mind and conduct in this case were egregious and go to the heart of the safety of our community and the nation. After a fair evaluation of the defendant's conduct, the nature and circumstances of the case, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the government submits that a substantial sentence is warranted in this matter.

Respectfully submitted,

Dana J. Boente
United States Attorney

By        /s/
Gordon D. Kromberg
Dennis M. Fitzpatrick
Assistant United States Attorneys

                                                   Attorneys for the United States of America
                                                   United States Attorney's Office
                                                   2100 Jamieson Avenue
                                                   Alexandria, Virginia 22314
                                                   (703) 299-3700
                                                   (703) 837.8242 (fax)
                                                   gordon.kromberg@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on July 8, 2016, I caused an electronic copy of the foregoing pleading to be filed and served via ECF on Joseph Thomas Flood, Esq., counsel for the defendant.

                                         By          /s/
                                                   Dennis M. Fitzpatrick
                                                   Attorney for the United States of America
                                                   United States Attorney's Office
                                                   2100 Jamieson Avenue
                                                   Alexandria, Virginia 22314