IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:16-cr-20-AJT |
| JOSEPH HASSAN FARROKH, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S CORRECTED MEMORANDUM IN AID OF SENTENCING

**COMES NOW** the Defendant, Joseph Hassan Farrokh*, by counsel and, in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G."), respectfully submits this memorandum in aid of sentencing to this Honorable Court. Based on a consideration of the Sentencing Guidelines as well as the factors set forth in § 3553(a), and in particular Mr. Farrokh's shallow commitment to extremist ideology, his background and history, his extraordinary acceptance of responsibility, his significant and continued cooperation with law enforcement authorities, his very low risk of recidivism, and the fact that the guidelines dramatically overstate his criminal history category and likelihood to re-offend, a downward departure and downward variance are both warranted, making a sentence of 63 months the appropriate punishment in this case.

## I.  PRESENTENCE INVESTIGATION REPORT AND GUIDELINE CALCULATIONS.

### A.  Sentencing Guidelines Calculation

Mr. Farrokh pleaded guilty on March 18, 2016, to one count of providing material support to a terrorist organization in violation of 18 U.S.C. § 2339B. Undersigned counsel has consulted with United States Probation Officer Nina Blanchard as part of her presentence

investigation. Counsel for Mr. Farrokh has reviewed the Presentence Investigation Report and has no additions, corrections, or objections. Ms. Blanchard has calculated Mr. Farrokh's base offense level to be 26. Applying the Victim Related Adjustment for Terrorism ("terrorism enhancement"), increases Mr. Farrokh's total offense level to 38 and his Criminal History Category from II to VI. Applying the three level downward departure for Mr. Farrokh's acceptance of responsibility[1] yields a final offense level of 35, resulting in a recommended sentencing range of 292-365 months. U.S.S.G. § 3A1.4. Because the maximum term of incarceration for this single conviction is 240 months, that becomes the starting "advisory guideline sentence". *United States v. Warsame*, 651 F.Supp.2d 978, 981 (D. Minn. 2009); U.S.S.G. §5G1.1(a).

**B.      Downward Departure under U.S.S.G § 4A1.3.**

Mr. Farrokh's guideline sentence dramatically, misleadingly, and unfairly overstates his career criminal category to a staggering degree. Prior to the actions that resulted in the criminal charge in this case, Mr. Farrokh had two minor misdemeanor offenses – DUI and possession of a switch-blade knife (Doc. 38 at 12-13) – which are remote in time and for which he served no jail time. According to all the historical witnesses interviewed by the defense Mr. Farrokh has

---

[1] Mr. Farrokh's acceptance of responsibility has been truly extraordinary because of its speed, sincerity, and certainty of purpose, as evidenced by the fact that the agreement accepted by the Court was actually the third agreement he executed, and it was entered under unusual circumstances. At the outset of plea discussions the United States agreed Mr. Farrokh would not be required to stipulate to the applicability of the § 3A1.4 enhancement. Recognizing the potentially severe consequences of this enhancement, the absence of this condition was a significant inducement to plead guilty. To that end, Mr. Farrokh executed a written plea agreement that did not mention the enhancement. Subsequently, about one week before the entry of the plea, counsel for the United States advised undersigned counsel "main Justice" had rejected the plea agreement because it was silent on the § 3A1.4 enhancement. Thereafter the prosecutors presented counsel with a second agreement identified this enhancement as a disputed issue that the parties were free to argue for or against, but said no more. Mr. Farrokh signed this agreement as well. On the date of the original plea hearing, however, the United States again advised Mr. Farrokh the agreement was unsatisfactory to main Justice, and Mr. Farrokh would not be required to stipulate to the applicability of § 3A1.4. This necessitated a one day delay. After learning of this change, Mr. Farrokh signed the third plea agreement which was later accepted by the Court, evincing a purity of purpose and willingness to take full responsibility and not delay the proceedings in any way.

always been a respectful, peaceful, and responsible person prior to his flirtation with the Islamic State ("ISIS"). After law enforcement authorities were alerted to Mr. Farrokh's activities, he participated in several meetings with confidential informants who shaped and furthered his radicalization after first determining he wished to travel to Syria to fight as as soldier in the war against Bashar Al Asaad. Immediately following his arrest, Mr. Farrokh began cooperating with the criminal investigation without any promised benefit. Subsequently, at the earliest moment possible, Mr. Farrokh pleaded guilty for his crime and agreed to provide substantial assistance to the United States in its investigation and future prosecutions. As a result of his pre-indictment guilty plea, acceptance of responsibility, admission of guilt, renunciation of ISIS, and ongoing cooperation, he has spared the United States significant expense and resources (Doc. 29, at 3-4), and represents an extremely low risk to re-offend.

"If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," a court has discretion to depart downward. U.S.S.G. § 4A1.3(b); *United States v. Moreland,* 437 F.3d, 424, 432 (4th Cir. 2006). In *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), the court made clear the broad discretion to depart downward extends in cases involving the terrorism enhancement: "A judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward at sentencing." Indeed, departures are "encouraged" where the applicable criminal history category fails to accurately reflect a defendant's true criminal history or the likelihood he will commit other crimes. *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003).

In *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007), a jury convicted the defendant of two counts of making false declarations to a grand jury, obstruction of justice, and making false statements to an FBI agent. The prosecution arose from the defendant's repeated denials – including in front of two grand juries - of having traveled to Pakistan and possibly Afghanistan to participate in terrorism training including handling and discharging firearms or explosive devices to prepare for violent jihad. *Id.* at 750-51. At sentencing, the trial court applied § 3A1.4 to increase Benkahla's offense level from 20 to 32, and his guideline range to 210-262 months. *Id.* at 757.

After determining § 4A1.3 allowed for a downward departure, the *Benkahla* court addressed the disproportionate effect § 3A1.4 had on the defendant's criminal history category: "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." 501 F.Supp.2d at 759. As to the second factor, the court found that increasing Benkahla's criminal history category to VI also over-represented the likelihood he would commit other crimes, noting Benkahla was not a terrorist and did not share the characteristics or conduct of a terrorist, and therefore, lacked "the same likelihood of recidivism, the difficulty of recedivism, or the need for incapacitation." *Id.* Consequently, because Benkahla had no criminal record and had otherwise been a model citizen, the court determined "his likelihood of ever committing another crime is infinitesimal", making him "the quintessential candidate for a downward departure under § 4A1.3." *Id.* Describing the disparity created by § 3A1.4 as "staggering", the court reduced Benkahla's suggested guideline range from a category VI to a category I, and his sentencing range from 210-262 months to 121-151 months, and imposed a sentence of 121 months. *Id.*

In *United States v. Aref*, 2007 U.S. Dist. LEXIS 17926, *3 (N.D.N.Y. 2007), the defendant was convicted of twenty-seven crimes, including one count of conspiracy to provide material support to a terrorist organization, and seven counts of attempting to provide material support to a terrorist organization, all in violation of 18 U.S.C. § 2339B. These convictions arose from a protracted conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the United States for the purpose of carrying out domestic terrorism. *United States v. Aref*, 2007 U.S. Dist. LEXIS 12228, at *6-11 (N.D.N.Y. 2007). Despite the elaborate nature of the conspiracy, the large number of convictions, the extensive planning involved to carry out the crimes, and its domestic aims, the court determined "that a criminal history category of VI does substantially over-represent the seriousness of [the defendant's] criminal history." *Id.* at *7.

> As indicated in the PSR at paragraphs 82 through 87, Hossain received zero total criminal history points as scored by the United States Probation Department. The credible and reliable evidence indicates that Hossain has provided for his family until his arrest through lawful employment and various capacities, and there is no indication that he has engaged in any other criminal activity in this country other than reported.

*Id.* at *8. Due to the defendant's lack of a criminal history and his personal characteristics, the court found "his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.* Because the court also exercised its discretion to run the sentences for all of the defendant's convictions concurrently, his sentence was effectively reduced from life imprisonment to fifteen years, or by over 50%. *Id.* at *22.

Compelling evidence shows Mr. Farrokh's (1) starting criminal history should be treated as a Category I, (2) criminal history category substantially over-represents the seriousness of his criminal history, and (3) criminal history category substantially over-represents the likelihood he will reoffend. Consequently, a substantial downward departure is warranted.

### 1. Mr. Farrokh's starting criminal history should be treated as equivalent to Category I.

"A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." § 4A1.3, commentary Application Note 3. Mr. Farrokh's circumstances fit this example perfectly because his first conviction occurred on May 5, 2006, when he received a one day suspended jail sentence for possession of a switch-blade knife, that he did not realize was illegal. (Doc. 38 at 12.) Mr. Farrokh was arrested on November 21, 2005, *id.*, just short of ten years prior to the instant offense. Absent this conviction, Mr. Farrokh's beginning criminal history would be Category I. His second conviction, drunken driving, is remote in time as well having occurred nearly nine years before the instant offense. *Id.* Because both offenses occurred nearly ten years before the instant offense and there were no other criminal convictions during the intervening period (and nearly nine years before the instant offense, *id.* at 13), calculating of Mr. Farrokh's starting criminal history as a Category II, substantially over-represents the seriousness of his criminal history, warranting an initial downward departure under § 4A1.3.

### 2. Applying § 3A1.4(b) substantially over-represents the seriousness of Mr. Farrokh's past criminal conduct.

Increasing Mr. Farrokh's Criminal History Category to VI dramatically and unfairly over-represents the seriousness of his criminal history. The current offense is a complete aberration because Mr. Farrokh is not a violent person and prior to this offense had never even been accused of a violent crime. He has never used, owned, or possessed firearms, and has always conducted himself in a peaceful, non-violent way. Mr. Farrokh's single offense stands in stark contrast to the defendants in *Benkahla* and *Aref*, both who received significant

downward departures, despite their multiple convictions and despite either actually traveling abroad for terrorist training and then lying about it to grand juries, or raising substantial sums of money with the intent of aiding domestic terrorism.

Court appointed risk assessment expert, Gregory Saathoff, M.D.[2], who completed a forensic psychiatric evaluation of Mr. Farrokh focusing on the prospect of his recidivism in the areas of terrorism-related activity and associated issues, found significant reliable information demonstrating "Mr. Farrokh's criminal history category substantially over represents the seriousness of his prior criminal history [because] the prior offenses constitute minor crimes for which Mr. Farrokh received no sentence of incarceration, and have no relationship to the current offense."[3] Furthermore, "Mr. Farrokh's relative youth, the relationship of these prior crimes to substance abuse and the absence of threat of violence/weapons, and the number of intervening years without arrest prior to his most recent offense[] are all mitigators."[4]

Because reliable information shows Mr. Farrokh's criminal history category substantially over represents the seriousness of his prior criminal history and the application of the § 3A1.4 would create a "staggering" increase in Mr. Farrokh's advisory guideline sentence - of between 421% to 522% (46-57 months vs. 240 months) - a significant downward departure is warranted under § 4A1.3.

**3.** **§ 3A1.4(b) substantially over-represents the likelihood that Mr. Farrokh will commit other crimes.**

Applying § 3A1.4(b) also substantially and unfairly over-represents the likelihood Mr. Farrokh would re-offend, which is very low. Mr. Farrokh promptly admitted his crimes

---

[2] Dr. Saathoff's curriculum vitae is attached as **Exhibit A**.
[3] Forensic Psychiatric Evaluation Report of Gregory Saathoff, M.D., of July 7, 2016, at 29 (a copy of this report is attached as **Exhibit B**).
[4] *Id.*

following his arrest and began debriefing with the United States and this cooperation has continued through the present. Virtually all of this cooperation was provided with *no promised benefit*, which is the strongest evidence Mr. Farrokh accepts full responsibility for his actions and unlikely to reoffend. Even more, cooperating in ongoing investigations of ISIS supporters and terrorists, puts Mr. Farrokh at significant personal risk.

Critically, Mr. Farrokh has formally renounced ISIS. In his letter to this Court for sentencing, Mr. Farrokh wrote: "I deeply regret becoming involved in supporting terrorism and am sickened by the crimes ISIS is committing on a daily basis. I renounce ISIS, its actions, and its violent extremist ideology. I hate what they stand for and I believe ISIS twists Islam and exploits people's concerns about injustice to radicalize and recruit. [S]eeing the truth about what ISIS is and what it does has helped free me from their ideology."[5] Renouncing ISIS and cooperating with law enforcement authorities in their pursuit of terrorists is compelling proof Mr. Farrokh has rejected ISIS, its goals, and the beliefs which led him to fall under the sway of his codefendant and online videos that contributed to his radicalization. Because this denunciation parallels his continuing cooperation it reflects a sincere change rather than a convenient alteration to gain a sentencing benefit.

In sharp contrast to the defendants in *Benkahla* and *Aref* who denied their many crimes, insisted on a trials then appealed their convictions, *see United States v. Aref*, 533 F.3d 72 (2d Cir. 2008), *cert. denied*, 556 U.S. 1107 (2009); *United States v. Benkahla,* 530 F.3d 300 (4th Cir.), *cert. denied,* 555 U.S. 1120 (2009), and declined to cooperate with law enforcement, Mr. Farrokh's acceptance of responsibility goes far beyond providing substantial assistance. Mr. Farrokh admitted his crime and pleaded guilty. He waived his right to be prosecuted on an

---

[5] Let. from Joseph Farrokh to Hon. Anthony J. Trenga, undated, at 1 (a copy of this letter is attached as **Exhibit E**).

indictment, his right to plead not guilty and have a jury trial, and his right to appeal. These actions are unequivocal proof Mr. Farrokh's extremist views were shallow and short-lived, that he has reformed and that he represents virtually no risk of committing future crimes.

In *Benkala* the defendant traveled abroad to train as a terrorist, fired high powered weapons during training, and took these actions with the explicit intent to join a terrorist organization. And for lying about his actions, including to a grand jury, he was convicted and punished. Even so, the sentencing court still found he was "not a terrorist" because he did "not share the same characteristics or the conduct of a terrorist," 501 F.Supp.2d at 759, and, therefore, concluded "there is no reason to believe he would ever commit another crime after his release from imprisonment." *Id.* These conclusions and reasoning apply with even greater force to Mr. Farrokh who possesses all of the same positive qualities, and more. *See* Point II. B, *supra*, at 15-32. Unlike Benkahla, Mr. Farrokh owned up to his crime immediately, took full responsibility, pleaded guilty, and cooperated with ongoing investigations. If Benkahla was the "quintessential candidate for a downward departure" because of his low risk to reoffend *id.*, it would be hard to imagine anyone less likely to commit other crimes or more deserving of downward departure than Mr. Farrokh, including Benkahla himself.

Dr. Saathoff determined Mr. Farrokh's general risk of recidivism is low: "Reliable information provided in court documents and in collateral interviews indicate that Mr. Farrokh's criminal history category substantially over represents the *likelihood* that he will commit other crimes in the future. Compared to other individuals in their twenties, Mr. Farrokh's risk state and risk status are significantly decreased, and his risk of recedivism is low."[6] Regarding the recidivism specific to terrorism related crimes, Dr. Saathoff found "his

---

[6] Saathoff Report, at 29.

risk of recidivism for terrorism-related crime is low … based on Mr. Farrokh's unique offender characteristics, nature of his involvement in this crime, and his accepting responsibility and substantial assistance to the United States.[7]

Because compelling evidence demonstrates the § 3A1.4(b) enhancement substantially over-represents the likelihood Mr. Farrokh will commit other crimes, a significant downward departure under § 4A1.3 is appropriate.

### 4.   Conclusion.

Unlike Benkahla and Aref, who denied their guilt and demanded trials and continued to fight on appeal, Mr. Farrokh promptly took admitted his crime and waived his legal rights. Also unlike Benkahla and Aref, who apparently presented no forensic proof of their likelihood of recidivism, Mr. Farrokh has adduced compelling forensic proof he is unlikely to re-offend generally, or to commit terrorism related offenses specifically. For all these reasons, the § 3A1.4(b) enhancement dramatically over-represents the seriousness of his past criminal conduct and likelihood he will commit other crimes, and downward departure from category VI to category I under § 4A1.3 is warranted, resulting in a starting guideline range of 168-210 months.

## II.   NON-GUIDELINE SENTENCING CONSIDERATIONS.

After calculating the guideline range, district courts then consider the factors in 18 U.S.C. § 3553(a) to determine whether a variance from the guideline range is warranted. *Gall v. United States*, 552 U.S. 32, 42 (2007). There is no presumption of reasonableness attached to the guideline range nor a presumption of unreasonableness of a non-guideline range sentence. At the conclusion of considering the guideline range and § 3553(a) factors in relation to the

---

[7] *Id.*

facts of the case, "the court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). Consideration of these factors emphatically shows that a sentencing range of 168-210 months is far "greater than necessary" to implement the purposes of § 3553(a), and that a significant variance is warranted. Because of the truly unique circumstances of this case, Mr. Farrokh respectfully requests that the Court grant a downward variance and impose a sentence of 63 months.

### A.      Nature and Circumstances of the Offense.

Mr. Farrokh pleaded guilty to providing material support to the Islamic State in violation of 18 U.S.C. § 2339B. The United States and the defendant have stipulated Mr. Farrokh attempted to travel to Iraq and Syria when he and his codefendant drove to the Richmond airport so he could board a plane. Mr. Farrokh acknowledges this is a serious offense and he accepted responsibility and pleaded guilty. (Doc. 30, at 1.)

Although Mr. Farrokh takes responsibility for his crime, the allegations obscure the essential nature of his role in the offense. Mr. Farrokh was a complete neophyte in radical extremism. His dalliance with ISIS arose from a shallow commitment to the cause, was in keeping with his search for identity and purpose and it would have almost certainly passed but for the intervention that occurred. His conversion to Islam and gravitation to an angry expression of his faith is a byproduct of personal problems, his struggle to overcome drug addiction through religion, and social dislocation. He was inspired to view extremist videos by his codefendant and by his concern about innocent people being killed in Syria. Having recently stopped using opiates, a drug he had been addicted to for nearly five years, with no treatment, Mr. Farrokh found solace in Islam, but his untreated dependency, struggle for identity, and need for validation made him vulnerable to the influences of his codefendant and extremist views.

Prior to Mr. Farrokh's wedding in August, 2015, his conversations with his codefendant were aspirational in nature. However, when the co-defendant introduced Mr. Farrokh to an undercover government agent, who then introduced him to two confidential informants (CI's), Mr. Farrokh was presented with the apparent possibility to actually travel. From approximately September, 2015, until January, 2016, Mr. Farrokh met with the CI's several times and during their meetings was further radicalized as he was indoctrinated and encouraged to develop increasingly extreme views. Over the course of these conversations there are numerous instances where Mr. Farrokh showed reluctance or even declined to adopt the views advanced by the CI's, but he nevertheless endorsed other, repugnant views, and reaffirmed his intent to travel abroad to join ISIS.

Importantly, over the course of these conversations Mr. Farrokh provides very little information and is primarily a receptacle for the CI's direction, information, and prosthelytizing. With few exceptions, Mr. Farrokh initiates almost none of the discussion related to dogma or extremist ideology, and when these topics are brought up by the CI's, Mr. Farrokh may assent, but rarely adds commentary or new ideas, and clearly accepted a position as a follower. An analysis of two of the transcribed statements – from meetings on November 8 & 15, 2015, comprising 56 pages of text - underscore Mr. Farrokh's passive receipt of radical ideology. Setting aside introductory greetings and the like, Mr. Farrokh makes only 311 total statements in these two conversations, 114 of which (or 36.7%) consist of monosyllabic answers, such as "yeah", "m-hmm", "uh-huh", "God willing", or similar affirmations. Over the course of those two conversations, Mr. Farrokh's comments constitute only 22% of the total dialogue and, excluding greetings and similar non-related conversation is excluded, his portion drops 18%. Significantly, the most detailed statements Mr. Farrokh makes are to repeat

verbatim a pledge initiated and required by the CI's, which he exhibits reluctance and discomfort in making. There is not a single instance where Mr. Farrokh speaks extemporaneously or at length about deep-seated extremist views or demonstrates anything to suggest sophisticated knowledge of ISIS or jihadism.

This is not to say that Mr. Farrokh was duped or tricked. He was not and he did demonstrate an intent to travel abroad. But his interactions with the CI's do reflect his naivete and lack of sophistication, as well as his passivity in participating, and the superficiality of his extremist views. As he notes in his letter to the Court:

> Thru Elhassan I met someone who introduced me to people that told me they would help me travel to Syria. Together with them we planned my travel overseas. Through this I had many doubts. I thought I would never have to do anything I didn't want to do and that I could leave anytime. I expressed to them I could never do certain things like those attacks committed in Paris, suicide bombs, etc. I felt pushed by them to do certain things, such as give a copy of my passport, say the oath of allegiance to ISIS, and say that I would be willing to kill American Soldiers in Iraq if I had to.[8]

Despite feeling pushed and even manipulated, Mr. Farrokh does not deny his own culpability and moral failings.

> I don't say this to deny responsibility and I don't blame the FBI or the confidential informants for what I did. I tell you this only so you can see that I am not saying I was brainwashed. I was impaired and making bad decisions and this made my consent to doing things easier. But I had not lost my faculties of reason or all my values. I was willing to join ISIS to fight Asaad, even if I did not agree with everything it was doing.[9]

As discussed in the next section, Mr. Farrokh is a bright, capable, hard-working, and kind man who had a promising future prior to becoming radicalized. Even so, his crime and related activities are a direct byproduct of his personal problems and untreated addiction. While he may be guilty of this offense, he is not a terrorist, and to the extent he advocated violent extremism,

---

[8] Joseph Farrokh Let. to Court, at 7.
[9] *Id.*

those views were superficial and a parroted from things he saw online or heard from his co-defendant. He has renounced them in the strongest terms.

### B.    History and Characteristics of the Defendant.

As set forth in the numerous letters, declarations, and reports appended hereto, Mr. Farrokh's offense is a complete aberration and totally out of character. Mr. Farrokh has always been a polite, hard-working, family-oriented man of good character, and the radical views that brought him to the airport in Richmond were transient and shallow. In keeping with his true values, Mr. Farrokh promptly took responsibility for his crime and began cooperating with authorities, has acknowledged an addiction for the first time, has made amends with his family, and has forcefully renounced ISIS and all violent extremism.

### 1.    Early life and familial disruption.

Mr. Farrokh was born in the Lehigh Valley of Pennsylvania, and spent the first thirteen years of his life with his family growing up there. He attended school at Parkland Elementary and Middle Schools in Schnecksville, Pennsylvania School District and showed academic promise[10], played sports, had a group of friends, and was socially assimilated. Although his father was emotionally reserved to a fault and not particularly engaged in his life, by all accounts Mr. Farrokh and his family lived a typical middle-class American life. Mr. Farrokh's father is an Iranian immigrant who came to the United States to attend college and stayed because he

---

[10] According to Mr. Farrokh's mother, Donna Farrokh, he "was a very good student and received the presidential award for academic excellence before he graduated from middle school." Let. from Donna Farrokh to Hon. Anthony J. Trenga, of July 5, 2016, at 1 (a copy of this letter is attached as **Exhibit G**). Mrs. Farrokh's observation is corroborated by Mr. Farrokh's elementary school records, showing that he received superior grades through the seventh grade, *see* Parkland School District Records for Joseph H. Farrokh, at 5, 3-39, 41, 45, 49, 53, 63 (a copy of these records are attached as **Exhibit U**), and instances where he sporadically obtained superior grades thereafter. *See* Benicia School District Records for Joseph H. Farrokh, at 6, (a copy of these records are attached as **Exhibit V**); Diablo Community College Records for Joseph H. Farrokh, at 1-2 (a copy of these records are attached as **Exhibit W**); Northern Virginia Community College Records for Joseph H. Farrokh, at 2-3 (a copy of these records are attached as **Exhibit X**); American School of Nursing & Allied Health Nurse Aide (CNA) Records for Joseph H. Farrokh, at 1 (a copy of these records are attached as **Exhibit Y**).

found work and married his mother, Donna Labarron, who grew up in Pennsylvania, and together they had three children. Jaleh Skeath, and Sara Hoekstra, Mr. Farrokh's older sisters, are twelve and nine years older, and had started to college by the time he was in middle school.

When Mr. Farrokh was thirteen, and essentially living as an only child, his family experienced significant economic crisis brought on by his father losing his job and the family's life savings through stock speculation.[11] This crisis sent the family into a emotional and financial tailspin and led to Mr. Farrokh being transplanted with his parents to Northern California. This transition, which occurred with no input from Mr. Farrokh, was emotionally and socially cataclysmic because he went from being a popular, well-liked, assimilated, high functioning student, to being a nobody with no friends and no emotional support. In the span of a few short months, Mr. Farrokh was removed from a supportive, highly functional life, to surviving in a cramped one-bedroom apartment in a dangerous area and attending a new school that he would leave after one year.[12]

What followed this transition was particularly damaging to Mr. Farrok's emotional development, maturity, and sense of identity. Within a few short years, laced with significant emotional and psychological conflict, Mr. Farrokh's father lost two jobs and relocated to Virginia, Mr. Farrokh attended multiple schools, the family uprooted to another community, and Mrs. Farrokh was required to take on a challenging job to assist in supporting the family.[13] These changes robbed Mr. Farrokh of any significant emotional support and he was left alone to deal with his un-addressed anger, resentments, and confusion. Mr. Farrokh, having lost the foundation of his life, was rudderless, acting out and, devoid of meaningful guidance.

---

[11] Donna Farrokh Let., at 1-2 (a copy of this letter is attached as **Exhibit G**).
[12] Saathoff Report at 4; Forensic Mental Health Evaluation Report of Sahair Monfared, Ph.D., at 4 (a copy of Dr. Monfared's curriculum vitae is attached as **Exhibit C**, and her report is attached as **Exhibit D**).
[13] Donnah Farrokh Let. at 1-2; Saathoff Report at 4-6; Monfared Report at 4-5.

According to Joseph's aunt, Edna Joyce Farrokh, "[t]he move to California was traumatic and disruptive for Joseph. Before his family relocated, [he] had close friends in Pennsylvania, and was involved in community activities, like playing sports. But when the family moved to California, Joseph struggled to adapt and it was very difficult for him to re-establish what he had in Pennsylvania."[14]

According to Sahair Monfared, Psy.D., a clinical psychologist who evaluated Mr. Farrokh, the disruption in his life resulting from the move and subsequent events "was a significant turning point" because he went from a community where he was well-adjusted, "emotionally close and connected to his family and had a sense of belonging," to a new milieu that was almost entirely lacking in "a sense of normalcy or validation," and his "increased level of frustration and anger surrounding this loss" was essentially ignored.[15] "As a result, Mr. Farrokh did not develop a sense of his own unique capacities, talents, and the characteristics necessary to form" develop a "productive core identity, individuality, and well being."[16]

### 2. Familial turmoil and conflict gives way to identity confusion.

What ensued as a result of the psychological dislocation and absence of support was a dramatic increase in family conflict and turmoil, and a growing estrangement as Mr. Farrokh struggled into his teen years.[17]

> Mr. Farrokh's relationship with his mother became increasingly complicated, emotion-laden and inappropriate wherein both appear to have taken out their feelings of isolation and frustration out on each other. As dysfunctional as the relationship became, it appears that the tie to his mother, despite its complications, was preferable to the isolation he would have experienced alone. In an attempt to maintain his own identity, while he was tied to his mother, Mr.

---

[14] Let. from Edna Joyce Farrokh to Hon. Anthony J. Trenga, dated July 1, 2016, at 1 (a copy of this letter is attached as **Exhibit N**).
[15] *Id.* at 9.
[16] *Id.*
[17] *Id.*

Farrokh hid beneath the masquerade of disrespect, aggression and anger. These experimental identities gave Mr. Farrokh a temporary sense of strength, cohesion, and self-esteem rather than chronically feeling weak and vulnerable. During his childhood, Mr. Farrokh was not able to develop empathy or self-esteem for himself and, therefore, acted out towards society as a defense to cover up the flaws in his self-image. Mr. Farrokh's parents' responses were conditional and chronically unempathic (i.e., absent, flat, anger, disappointment), thus inhibiting the development of a strong sense of identity within Mr. Farrokh and resulted in an impaired capacity for him to develop realistic goals, regulating ambitions and ideals, and establishing a sense of belonging and being like others. Furthermore, his lack of identity caused Mr. Farrokh to feel empty, bored, and apathetic and made him vulnerable to addiction and other self-destructive behaviors, and contributed to him becoming susceptible to developing radical views.[18]

Mr. Farrokh's struggle manifested primarily in three domains: (1) identity confusion and striving to fit in; (2) working far below his capacity in school; and (3) beginning to experiment with drugs and alcohol as a way to escape. According to Mr. Farrokh's older sister, Jaleh Skeath, "when he was in California, he would go from one group to another. He was acting like he was Mexican and then at my wedding he had slicked back hair, like Al Pacino"[19] Sara Hoekstra, the middle sister, has a similar recollection of Joseph during his teen years: "He went from one group of friends to another. He was into mafia movies for a while, and then it seemed like he was hanging out with a bunch of Hispanics. It was almost like he took on this new personality. If you didn't know better, you would think he was Hispanic."[20] Mr. Farrokh's friend from high school, Charles J. Scott, also recognized "Joseph tried to fit in with everyone else. [He] spoke with an east coast twang, so everyone called Joseph 'Jersey Joe.'"[21]

---

[18] *Id.* at 10.

[19] Saathoff Report at 7.

[20] *Id.*

[21] *Id.* Mr. Scott also told Dr. Saathoff that Mr. Farrokh "presented himself as being an Italian from New Jersey. He led us to believe that he was Italian. He was always wearing a Yankees hat. I am 99.9% positive that people in Benicia felt that he was from New Jersey." *Id.* Another high school classmate, Benjamin Egan, recalls Mr. Farrokh telling "kids that he was Italian and from the East Coast," and later, while working "at a restaurant with a group of Hispanics" trying "to fit in with them as if he too were Hispanic. Mr. Farrokh drank Corona Beer, and tried to cook carne asada and speak Spanish." Declaration of Lindsay Page based on interview of Benjamin Egan, dated July 1, 2016, at ¶ 5-6 (a copy of this declaration is attached as **Exhibit Q**).

After demonstrating significant promise as a student prior to arriving in California, Mr. Farrokh floundered academically, became disruptive in school, and began absenting himself from this critical protective environment. In his first semester at Benicia High School, Mr. Farrokh received two A's, three B's, one C, and one D, with the latter two being his first poor grades.[22] In the second semester that year his grade point average dropped almost an entire grade point. During his sophomore year, Mr. Farrokh showed some improvement but by the end of his junior year he was failing all of his classes.[23] As a result of this poor showing, Mr. Farrokh was required to attend summer school following his Junior year, but was expelled the following fall.[24]

Mr. Farrokh's abject failure in school reflects the turmoil in his home and his plummeting self-esteem, and it appears his parents failed to appreciate that the root cause did not originate with Mr. Farrokh, but with their own failure to provide adequate support, direction, and structure. Mr. Farrokh's mother now recognizes that as her son's "interest in school [was] collapsing [she] did not know what [to] do to help."[25] From Mr. Farrokh's perspective, because his parents valued academics above all else, his failures in school were viewed as a moral failing which they treated with contempt. "[B]oth of my parents were extremely judgmental and I grew up feeling like I was a failure and did not measure up to their expectations…. [all] my father … seemed to care about" were grades "and he'd say things that made me feel even worse. He never … show[ed] any interest in anything other than my bad grades."[26] Mr. Farrokh's "mother would tell" him he "wouldn't amount to anything" and "she would call [him] lazy and 'good for

---

[22] Benicia High School Records, at 7.
[23] *Id.*
[24] *Id.*
[25] Donna Farrokh Let. at 2.
[26] Joseph Farrokh Let. at 1, 3.

nothing.'"[27] "Throughout the entirety of Mr. Farrokh's life, enormous pressure was placed on him to become successful through higher education, and when he failed to live up to his parents expectations, his failures were met with harsh recriminations that underscored his parents' disappointment in him and his sense of failure."[28]

As a result of his overwhelming sense of failure, Mr. Farrokk began experimenting with drugs and alcohol while in high school, and thereafter, used drugs as both an escape and a primary coping mechanism for the toxic relationships with his parents. Everyone in Mr. Farrokh's family recognized his estrangement from the family pushed him to begin identifying with a rougher crowd of people who used drugs but apparently did not judge him as acidly as his parents. By trying to fit in with a different group, Mr. Farrokh was seeking identity and meaningful connection, but he was also exposed to drugs and alcohol, and pulled him away from his core values. This amplified his already overwhelming sense of guilt and shame and pushed him into self-destructive behaviors.

> When I was 15 my father moved to Virginia for work leaving my mother and me alone in California. No one ever asked me if I agreed with this and it seemed that no one cared. My mother then started working full time. From then on I was on my own all the time and things started to get worse for me. I began skipping school more and getting into more serious trouble. I started to experiment with alcohol and marijuana. My relationship with my father at that time was non-existent and my relationship with my mother was very bad as well. I remember feeling a strong sense of guilt and shame that everything bad that was happening was my fault – angry all the time, and I needed to just act right.[29]

### 3.      Absence of father amplifies estrangement.

As Mr. Farrokh's personal problems were cresting, his father returned to the east coast alone and without consideration for his son's best interests. Hashem Farrokh's untimely

---

[27] Saathoff Report at 6.
[28] Monfared Report at 9.
[29] Joseph Farrokh Let. at 2.

departure from his son's life splintered even further Mr. Farrokh's rickety emotional support, and inflicted a wound that still has not completely healed. "For years Mr. Farrokh was unable to acknowledge the impact of having an emotionally absent father who ultimately absented himself from Mr. Farrokh's life in his mid-teens."[30] According to Mr. Farrokh's mother, Hashem "was not able to provide meaningful parenting to Joseph or support for me in my efforts to do so. This further increased the conflicts between Hashem and and I and I ended up feeling totally discouraged in trying to parent Joseph."[31] After Hashem left California, he spoke with his son infrequently on the phone, but their conversations always devolved into him fixating on his son "being a bad student and being ungrateful."[32] "He never asked [his son] what was bothering [him], if there was anything he could do to help … or show any interest in anything other than" Mr. Farrokh's bad grades.[33] In addition to losing one of his last emotional supports, Hashem's departure amplified the strains in his relationship with his mother, which "became increasingly complicated, emotion-laden and inappropriate wherein both appear to have taken out their feelings of isolation and frustration out on each other."[34] From then on, Mr. Farrokh was essentially left alone to navigate the dangerous shoals of his emotional struggle and yearning for identity and a sense of belonging.

### 4.    Mr. Farrokh's search for identity and belonging.

The functional dissolution of Mr. Farrokh's family and the incessant recriminations propelled him to seek an identity and a sense of belonging outside the family. Because the conflicts "underscored the conditional nature of" his parents regard and led to deep feelings of

---

[30] Monfared Report at 10
[31] Donna Farrokh Let. at 2.
[32] Joseph Farrokh Let. at 3.
[33] *Id.*
[34] Monfared Report at 10.

inadequacy and humiliation … his sense of a core identity was more fragile" than what "he attempted to portray."[35] Dr. Monfared described Mr. Farrokh as

> an individual who has been in search of his identity throughout his life. His father emigrated from Iran and his mother was born and raised in the United States. Mr. Farrokh is a first generation American; he is unable to fully identify himself as American or fully identify himself as Iranian. Not uncommon to other first generation Americans, Mr. Farrokh was confused in regards to his core identity and which culture to identify with, resulting in a profound sense of isolation and aloneness in the world. In response, Mr. Farrokh developed the adaptive strategy of adopting, embracing and identifying with others – essentially taking on new identities because he lacked a clear sense of who he was - as a way to assimilate and connecting with them and the world, and avoiding social isolation. In the absence of having a clear identity of his own, Mr. Farrokh tended to seek out and take on the identity of others quickly to make up for the functions he lacks within himself in order to heal. This helped temporarily fill the emptiness and diffuse the shame that he felt internally; thus reassuring Mr. Farrokh that he mattered in the world. He first identified himself as Italian, next Hispanic, still later as "thuggish", and finally the identity of being an ISIS member.[36]

Critically, these adaptations were superficial and relatively short in duration demonstrating an identity crisis rather than a deeply held set of beliefs. "[H]is quick adaptation was, by its very nature, extremely shallow and superficial in its demeanor and do not represent his true character. Mr. Farrokh's main motivation for this was to support his self-esteem, self-cohesion, and sense of self-continuity; he did not know who he was or what really mattered to him."[37]

Subsequently, Mr. Farrokh took on the trappings of being a warrior for the suffering people in Syria, believing that ISIS was fighting a just war to protect Muslims and that jihad would provide him with identity, validation, and a sense of belonging to something with purpose. As Mr. Farrokh recalls: "The ISIS propaganda videos showed a sense of community and brotherhood, something which I always craved. I needed that sense of belonging. The idea

---

[35] *Id.*
[36] *Id.*
[37] *Id.*

to travel to Syria to take part in fighting, was made to seem like a way to do something great and become the best Muslim I could be."[38] Mr. Farrokh's

> sense of isolation, loneliness and lack of personal identity is what made [him] vulnerable to the extreme philosophies of ISIS.  Mr. Farrokh adopted the identity of an ISIS member because it provided him with a sense of brotherhood, a sense of purpose, a sense of family and not feeling like he was a failure and a sense of being successful. These are the same qualities that drew him to adapt the Italian culture in is adolescence and the Hispanic culture in his early 20s. During periods that Mr. Farrokh was unable to take on the identity of others he was left feeling empty, sad, alone and questioning his purpose in life. It was during these periods that Mr. Farrokh would retreat to opiate pills as a means to numb his lack of self-concept and self-esteem.[39]

### 5. Drug addiction.

By his early twenties, Mr. Farrokh had begun using opiates and quickly developed an addiction that would define, in one way or another, his life until the offense. From 2009, until he finally quit in late-2013, Mr. Farrokh used the opiates OxyContin, Oxycodone, Percocet, and Vicodin on a daily basis interspersed with periods of sobriety. During this time, he never received or sought treatment. His drug use contributed significantly to his already significant personal problems – in particular his deep sense of shame and being a failure - further strained his relationships with his family, and deepened his isolation and detachment. Although he was able to successfully hold jobs while addicted, his Opiate Use Disorder prevented him from succeeding academically, bringing on new invective from his parents. It was not until he converted to Islam that he was able to stop using drugs.

By his own account, Mr. Farrokh used drugs to numb his emotional pain: "opiates would take away the pain while I was high and fill the emotional void in my life, similar to the way Islam did later…. I felt a deep shame for using drugs and tried to quit them many times on my

---

[38] Joseph Farrokh Let. at 7.
[39] Monfared Report at 11.

own without treatment. Every time though, I would start to use again, and each relapse made me feel worse about myself."[40] "Substance use and abuse of opiods, and his repeated attempts to stop using these drugs without the benefit of rehabilitation programs or therapy played a significant role in Joseph Farrokh's life. His battle with substance dependence, both in California and Virginia, cannot be overemphasized in its important in understanding the motivations behind many of his behaviors", including, and particularly, becoming radicalized.[41] Indeed, "it was not until he rejected all drugs that he adopted a strict religious value system that later evolved into his acceptance and support of the violent ideology of ISIL."[42]

### 6.    Untreated addiction contributed to radicalization.

Undoubtedly, Mr. Farrokh's decision, and capacity, to stop using opiates and devote his life to Islam was the critical turning point that set his radicalization in motion. The first time Mr. Farrokh prayed five times in one day, in accord with Islamic practice, was the first day of his sobriety.[43] According to Mr. Farrokh,

> I never got treatment or dealt with the reasons for why I used drugs in the first place. I still had anger and emotional problems. The shame and pain I felt from being addicted to drugs was so great it was almost overwhelming and caused me to want to use the drugs even more. I was miserable and made everyone around me miserable, which just made everything worse. In late 2013 I made another commitment to stop taking drugs on my own again and the way I did this was to begin practicing Islam devoutly, praying five times every day and attending Muslim services[.][44] ….

Critically, although, Mr. Farrokh abstained from drugs, he never addressed the underlying causes of his addiction, developed constructive coping skills to remain abstinent, developed insight and emotional support, or even talked about his addiction. As he

---

[40] Joseph Farrokh Let. at 4.
[41] Saathoff Report at 9.
[42] Saathoff Report at 20.
[43] Let. from Joseph Farrokh to Nina Blanchard ("Probation Let."), dated June 15, 2016, at 1 (a copy of this letter is attached as **Exhibit F**).
[44] Joseph Farrokh Let. at 5.

acknowledges, "[a]ll of this was left unaddressed and [all the] reasons for using were still very much there."[45] "Islam filled his cravings and the sadness that he felt and that he was trying to change himself 'to be a better person.' [W]hen he was high on opiate pills he was 'relaxed, not worried about anything" and after he stopped using drugs he "went 'all into' religion."[46] Because he "finally stopped using drugs … through religious devotion," Mr. Farrokh "became motivated to deepen" his "faith and become the best Muslim [he] could be."[47] In essence, his religious devotion became his new addiction.

### 7. Mr. Farrokh's radical views developed quickly, were heavily influenced by his co-defendant, but ultimately very shallow.

At this critical juncture in his life, Mr. Farrokh met his co-defendant, Mahmoud Amin Mohamed Elhassan, a devout Muslim who was working at the mall where they were both employed. Although Mr. Elhassan was a few years younger, he had lived overseas, spoke fluent Arabic, was charismatic, and appeared to have a vast knowledge of Islam and the Quran. Mr. Farrokh admired Mr. Elhassan's fluency with Islamic practices and traditions and he developed what felt like a healthy fraternal bond. They talked easily about their faith, their ambitions, and life experiences.[48] Mr. Elhassan, who already held extremist views and was very politically aware, accepted Mr. Farrokh like a brother, shared his feelings "about the Bashar Al Asaad regime in Syria," and encouraged Mr. Farrokh to view ISIS videos on YouTube.[49]  Unknown to Mr. Farrokh, Mr. Elhassan had been under FBI surveillance for nearly two years.

Mr. Farrokh experienced his relationship with Mr. Elhassan and the beliefs he adopted as fulfilling a yearning for validation, identity, and fraternity, and he quickly began to adopt

---

[45] *Id.*
[46] Monfared Report at 6.
[47] Joseph Farrokh Let. at 6.
[48] *Id.*
[49] *Id.*

Elhassan's radical ideology.[50] In a short time they began to discuss the possibility of traveling abroad to join ISIS and fight against the Asaad regime. It took Mr. Farrokh "three months to radicalize – from August to October."[51] In discussing the speed of his radicalization, Mr. Farrokh provided insight into the influences: "I think that [the reason] I was able to be convinced by Elhassan and the propaganda videos was that I needed some sort of meaning in my life, and needed to do something great and to feel successful. I guess to fill that void, previously I had these misgivings and took drugs to fill that void."[52] And, of course, it was Mr. Elhassan who recruited Mr. Farrokh, had the contacts in the ISIS community, and introduced Mr. Farrokh to all the individuals who could feasibly facilitate travel, including the government agent and CI's. Unlike Mr. Elhassan, Mr. Farrokh had no online presence, had no international contacts, did not blog or tweet, and never uttered a public statement in support of ISIS. He was a total newcomer, and a reluctant one at that.

"Like other identities that he has embraced, such as an Italian from New Jersey and a Mexican from California," Mr. Farrokh "abandoned the ISIL identity that he had adopted in August of 2015" in a matter of days[53], thereby demonstrating the views he espoused were superficial and quickly abandoned. They did not and do not represent his true beliefs or values, or who he is. Rather, "[j]ust as in the other identities described by friends and family" Mr. Farrokh's flirtation with ISIS "appears to have been associated with a tribal need to belong to a group composed of young men and to be accepted by others."[54]

---

[50] *Id.*
[51] Saathoff Report at 16.
[52] *Id.*
[53] *Id.* at 16, 25.
[54] *Id.* at 25.

Since his arrest Mr. Farrokh has taken every step conceivable to demonstrate he has renounced ISIS and condemns their actions. He has taken public actions that have real-life consequences – including pleading guilty and cooperating with authorities – as well as private actions to repair the relationships he has injured by committing this offense. In interviews with Dr. Saathoff, Mr. Farrokh not only emphasized his shame and embarrassment for preparing to join ISIL … but also his moral obligation to his new wife, soon-to-be-born child and his former co-workers at the hospital. His nightly phone calls with family and regular visits are an indication of the current attachment he feels with his family."[55]

### 8.      No prior history of violence or violent crime.

As discussed previously, and as set forth in the Presentence Investigation Report, Mr. Farrokh has two prior misdemeanor convictions, neither of which involve an allegation of violence, and both of which are extremely remote in time. Neither of these crimes were committed for secondary gain, or to further any personal interest, and are entirely consistent with Dr. Saathoff's conclusion that there is an absence of evidence that Mr. Farrok has a history of maintaining violence conducive or negative attitudes.[56]

### 9.      Good character.

Despite his personal struggles and flirtation with ISIS, Mr. Farrokh is universally viewed in an extremely favorable light and a person of good moral character by the people who know him. He is kind, generous, respectful, polite, industrious, intelligent, hard-working, considerate, loving, thoughtful, un-bigoted, devoted, sincere, and dedicated. A review of the character letters and records demonstrate his essential good character.

---

[55] *Id.* at 26.
[56] *Id.* at 23.

### 10. Profound remorse.

Although touched on above, it warrants a separate mention that Mr. Farrokh feels profound shame and remorse for his crime because of the impact it has had on his family and his unborn son, on his future, and because he surrendered his moral values. His remorse is shown not only in his acceptance of responsibility and willingness to assist the United States in any way he can, but in the efforts he has undertaken to address his personal problems and make amends with his family. In his letter to this Court, Mr. Farrokh wrote:

> When I see the atrocities committed by ISIS on a daily basis, like the shooting in Orlando or the Bombing in Istanbul, I am disgusted by it, but I am also disgusted by myself. I wonder what kind of sick person could do such a thing but then I realize, I was willing to join that same group. In no way do I want to be associated with anything like that. That is not who I am. I am not that kind of horrible person nor have I ever been. I am deeply regretful and ashamed of what I have done. I accept the there will be consequences that I will have to pay because of my actions.[57]

The sincerity of his remorse is beyond dispute and can be measured by his words and deeds.

### 11. Consistent employment – strong work ethic.

Since even before he became an adult, Mr. Farrokh has maintained consistent employment and has proved in multiple contexts that he is a very hard-working, committed employee who cares about the mission of the service he has provided. Even during his period of opiate addiction, Mr. Farrokh was gainfully employed and made punctuality to his job and maintaining employment a high priority in his life. According to Mr. Farrokh, he developed a strong work ethic in high school and carried that with him the rest of his life.[58] Maintaining employment and putting forth great effort has been one of his most consistent and redeeming qualities, and an anchor for his future. His mother described him as someone who always

---

[57] Joseph Farrokh Let. at 8.
[58] *Id.* at 3.

worked hard and was well respected by his employers. This is born out by the declarations signed by a former supervisor and two co-workers at his last job at the Virginia Hospital Center, where he worked for nearly a year as a Patient Care Assistant, who describe him as "a great member during group projects," "an excellent young man," "very polite," "an excellent nurse" who was "dedicated," "a great hire," "a hard worker" who enjoyed interactions with patients," "was kind, helpful and always had a great attitude," "a great member of the team," "compassionate towards patients," and someone who "always volunteered to take on tasks."[59]

Mr. Farrokh's excellent employment history is both a protective factor in assessing the likelihood of re-offending and a free-standing mitigating factor because it reflects a set of values that prioritizes being productive and industrious. "Upon his eventual release, he possesses the intellect and social skills to function productively in legal, gainful employment in the setting of a supportive wife and family."[60]

### 12.    Model inmate – excellent pretrial adjustment.

Mr. Farrokh has been continuously incarcerated at the Alexandria Adult Detention Center since January 15, 2016, and during that period he has been a model inmate and complied with jail rules and regulations, evincing a respect for authority. That he has made an excellent adjustment to pretrial detention is born out by Mr. Farrokh's incarceration records[61], reflects that his core character is peaceful, law-abiding, and respectful. Mr. Farrokh's model adjustment is a critical data point in assessing his future behavior, both in prison and upon his release.

---

[59] Declaration of Esi Gyenin, dated 7/2/16, at 1-2; Declaration of Hamid Makry, dated 7/2/16, at 1; Declaration of Monica Hixon, dated 7/2/16, at 1-2 (copies of these declarations are attached as **Exhibits R, S,** and **T** respectively).
[60] Saathoff Report at 28.
[61] Mr. Farrokh's inmate records from the Alexandria Adult Detention Center are attached as **Exhibit Z**.

**13.    Mr. Farrokh has taken a proactive approach to addressing his personal problems and rebuilding his relationships with is family.**

Since his arrest, Mr. Farrokh has been proactive in using his time wisely to reconnect with his family, make amends, and begin addressing the deeper root causes of his emotional problems. This started with taking responsibility for his crime, making his family and his future the priority, and beginning to confront the myriad of issues that led him to this point. In this regard, Dr. Monfared concluded:

> Mr. Farrokh has shown insight into the underlining reasons behind his need to adopt the identity of ISIS (i.e. lack of identity and self-esteem), including an ability to identify how he became vulnerable to extreme viewpoints due to his sense of loneliness, isolation, lack of identity, and need to have a purpose in life. Furthermore, Mr. Farrokh has begun to develop skills to manage his issues in the future. First, Mr. Farrokh appears to have built a stronger interaction with his nuclear family in which he is more open and honest with them. Second, Mr. Farrokh has begun to take responsibility for his opiate addiction. After years of masking and denying his addiction, Mr. Farrokh has expressed the desire to share his experiences during his addiction with his family and make amends with anyone whom he had harmed during his addiction. He has expressed the desire to enter a drug treatment program to assist him better recognize his triggers and help him maintain his sobriety. Next, Mr. Farrokh's strong work ethic throughout his addiction and radicalization indicates he continues to have strong desire to be a productive and industrious member of society. Finally, Mr. Farrokh has indicated that he would like to participate in individual psychotherapy in order to develop a stronger core identity and avoid adapting any future maladaptive behaviors.[62]

Dr. Saathoff similarly observed Mr. Farrokh has more constructive relationships with is family, and has spent significant time reading, exercising, and reconnecting with his family.[63]

**14.    Wife and son.**

Mr. Farrokh is dedicated to his family and this is reflected in his admission of guilt, acceptance of responsibility, and willingness to cooperate with the United States in every way

---

[62] Monfared Report at 11 (footnote omitted).
[63] Saathoff Report at 12, 25,

possible, and this a reflection on his core values and the priority he places on family responsibilities. Since his incarceration Mr. Farrokh has spoken with his wife nearly every day and has made strenuous efforts to atone for his crime with his wife and his secretive and dishonest behavior. Mr. Farrokh believes his relationship with his wife is the primary foundation of his future and it is critical re-establish trust with his wife in order to build a life. Ms. Cheema is expecting to give birth to Mr. Farrokh's son on July 31, 2016, and Mr. Farrokh takes very seriously the need not only to be a role model to that child, but a provider as well. His commitment to his wife and unborn son is an anchor in his life as well a set of responsibilities that he intends to meet every day going forward.

### 15.   This offense is an aberration.

For all the reasons set forth above, Mr. Farrokh's brief immersion into ISIS extremism is a complete aberration and totally out of character. As such, his actions are neither representative of his true values or something that will be repeated.[64]

### C.   The Seriousness of the Offense, Respect for the Law, and Just Punishment.

Mr. Farrokh's crime is a serious offense that has already carried significant consequences for him and his family. In addition to being removed from his home, being incarcerated pending trial, and facing years in prison, Mr. Farrokh's actions breached a trust with his family, brought unwanted attention and hostility upon them, and has permanently stigmatized himself, his parents, his siblings, and many other people who knew him.[65] Most painful for Mr. Farrokh and his wife is the fact that his son, their first child, will be born later this month while he is

---

[64] Saathoff Report at 28-29.
[65] During the investigation of this case, undersigned counsel contacted more than two-dozen individuals, including extended family, friends, teachers, and co-workers, who viewed Mr. Farrokh in favorable terms but declined to provide a statement and requested that their name not appear in connection with this case due to the nature of his offense.

incarcerated, and Mr. Farrokh will lose out on the first critical years of his son's life. Mr. Farrokh's commission of this crime has also permanently altered what had been a very promising future. Prior to his involvement in this offense, Mr. Farrokh had a continuous history of gainful employment, was highly respected by his colleagues, and no serious criminal record. Going forward, Mr. Farrokh has undermined his prospects for a career and to provide for his family, which is his number one priority. He is a bright man who, by his own choices, has dramatically altered his future. He will likely be on a permanent "watch list," not be allowed to travel outside the United States, and have immense difficulty ever attending college or obtaining employment commensurate with his ability and intellect. These consequences are severe and long lasting.

Mr. Farrokh has acknowledged the seriousness of his offense and respect for the law by admitting and taking responsibility for his crimes, providing immediate and comprehensive cooperation with authorities, and pleading guilty. Through these actions Mr. Farrokh has distinguished himself by showing he is capable of reform, willing to make the right choices even if they have severe consequences, and that he is no danger to society. A just punishment, therefore, should take into account the fact that views he held that led to this offense were shallow and transient, and that his conduct since committing this crime, including renouncing ISIS, shows he is capable of making a meaningful contribution to society. A needlessly long sentence will be ruinous and counterproductive.

### D.    Deterrence and Protection of the Public.

For the reasons set forth previously, *see* Point I.B., *supra*, at 2-11, counsel submits that Mr. Farrokh's risk to commit future crimes or future acts of terror are infinitesimal. He has taken full responsibility for his actions, accepts that he will be punished, and has fully

cooperated with authorities, evincing his respect for the lawful authority of the United States government. His crime is indicative of the convergence of his recent conversion to Islam, the influence of more sophisticated ISIS recruiter, and an untreated addiction; circumstances that will never arise again. Because he is not a terrorist, a needlessly long sentence will have no further deterrent effect or provide any additional protection to society. *Benkahla,* 501 F.Supp.2d at 759.

### E.     Unwarranted Sentence Disparities.

Section 3553(a)(6), directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Farrokh submits that several recent cases, involving individuals who attempted to travel abroad to join a terrorist organization, constitute the most appropriate comparable sentencing outcomes and, therefore, support the sentence requested here.

### 1.     *United States v. Conley*, 14-CR-163 (D. Colo. 2014).

Shannon Maureen Conley pleaded guilt to one count of conspiracy, in violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B, for having provided material support to Al-Qaeda and its affiliates, including ISIS. According to the plea agreement, Ms. Conley met her coconspirator, Yousr Mouelhi on the internet in 2014 and thereafter, discussed their mutual beliefs and support for violent Jihad. After Mouelhi advised Conley that was an active ISIS fighter in Syria, she agreed to travel to Syria to assist. Thereafter, on September 7, 2013, Conley joined the United States Army Explorers (USAE) in order to receive military training in tactics in firearms for the purpose of heling ISIS. On February 7-9, 2013, Conley traveled from Colorado to Texas to attend the USAE training. On March 29, 2014, Mouelhi purchased Conley an airplane ticket so that she could travel to Turkey. On April 8, 2014, Conley traveled to the

Denver International Airport to fly to Turkey, but was apprehended before she could board the plan. *United States v. Conley*, 14-CR-163, Plea Agreement (Doc. 37), at 7-9 (D. Colo. Sept. 10, 2014).

When arrested, Conley was in possession of numerous items demonstrating proficiency and certifications of a number of specialized skills, including first aid/nursing certification, U.S.A.E. Certification, National Rifle Association certification and a first aid manual. *Id.* at 9. Agents also recovered DVDs of Anwar Al-Awlaki lectures, books about Al-Qaeda, its affiliates, and jihad, and shooting targets labeled with the number of rounds fired and distances. *Id.* Conley, who was 19 at the time of the crime, pleaded guilty and agreed to provide assistance to the United States. Her initial adjusted offense level was 35, based on the application of the terrorism enhancement. The district court sentenced Conley to 60 months imprisonment. *United States v. Conley*, 14-CR-163, Final Judgment (Doc. 79), at 7 (D. Colo. Jan. 26, 2014).

## 2. *United States v. Wolfe*, 1:14-cr-213 (W.D. Tex. 2014).

Wolfe was charged with and pleaded guilty to one count of providing material support to a designated terrorist in violation of 18 U.S.C. § 2339B, based on his extensive efforts and planning to go to Syria to join ISIS for jihad. This planning included: (1) obtaining new, more durable eye glasses that would hold up on the battlefield; (2) researching airline itineraries to travel to Europe on January 4, 2014; (3) creating a ruse to disguise the actual nature of his travel; (4) planning to raise money to finance the travel; (5) obtaining special certifications for his and his family's birth certificates to facilitate travel; (6) requiring his wife and two undercover officers to watch a video regarding foreign fighters in Syria in preparation for joining the fighting; (7) raising money to finance travel to Syria; (8) purchasing airline tickets to Dennmark; (9) communicating in codes to disguise his intentions from authorities; (10)

33

obtaining an address in Turkey to send an advance package; and (11) going to the airport in Houston, Texas, to board an international flight with the intent of joining a terrorist organization. *United States v. Michael Todd Wolfe*, 1:14-cr-213, Criminal Complaint, at 2-11 (W.D. Tex. June 6, 2014). During the planning of this trip, Wolfe showed he intended to bring his wife and two young children. Mr. Wolfe, who was 24 years old, pleaded guilty and received a sentence of 82 months.

### 3.     *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014).

Pratheepan Thavaraja, a Sri Lankan native, was the principal procurement officer for the Liberation Tigers of Tamil Eelam ("LTTE"), a foreign terrorist organization. He was detained in Indonesia and extradited to the United States in 2007. In June 2009, he pled guilty to conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and conspiracy to bribe public officials. The district court applied the terrorism enhancement, elevating the defendant's base offense level to 40. Ultimately, although the suggested guideline sentence was 240 months, the district court sentenced him to 108 months imprisonment, a 55% downward variation from the Guidelines range. 740 F.3d at 257.

At the time of his apprehension, Thavaraja was 33 years old, had been engaged in a prolonged pattern of terroristic activity as the chief procurement officer of an entire terrorist organization, and attempted to bribe a public official when caught. In fact, the district court acknowledged that the defendant's "'function [in procuring arms for the LTTE] was critical and involved . . . procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians.'" 740 F.3d at 258. As such, he was not only more deeply involved in a terrorist organization than Mr. Farrokh, but far more morally and criminally culpable. Despite his crimes, the court found the substantial downward variance was warranted

because Thavaraja had no prior criminal record and "taught and worked with other inmates while in pretrial detention to the extent … the district court was convinced he was 'a person of substance and decency.'" 740 F.3d at 260.

      **4.**     ***United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009).**

In *Warsame*, the defendant – who was born in 1973 - was sentenced to 92 months imprisonment even though he traveled to Afghanistan before September 11, 2011, trained with al-Qai'da, and met and attended lectures by Osama bin Laden, continued to keep in contact with al-Qai'da after he returned to Canada and then moved to the United States. 650 F. Supp. 2d at 979-80. Warsame pleaded guilty to one count of conspiracy to provide material support to a designated foreign terrorist organization under § 2339B, and had the terrorism enhancement applied to his case, resulting in a base offense level of 35, criminal history category of VI, and a sentencing range of 292 to 365 months. Because he had no other criminal history, was not eligible for an enhancement for playing a leadership role or using a minor in the offense, and the government requested a downward variance from 180 to 150 months (defendant requested a sentence of 67 months), the court granted a 49% downward variance. *Id.* at 980-81.

      **5.**     **Analysis.**

Although there has been a proliferation of terrorism cases over the past decade, those referenced herein are the most applicable comparison cases because each defendant was either found guilty of violating § 2339B, or, as in *Conley*, a conspiracy offense that referenced that statute. Each of these defendants eventually pleaded guilty, thereby saving the United States valuable resources, had little or no prior criminal history, and initial base offense levels that exceeded the statutory maximum sentences. The sentences imposed for these similarly situated defendants ranged from 60 months for Conley, to 108 months for Thavaraja. For three of these

defendants (Conley, Wolfe, Warsame), their primary conduct involved attempting to travel abroad or doing so, all three engaged in far more advance planning and/or showed significant sophistication in their criminal activity. For instance, Conley engaged in numerous training programs to prepare her for war in the year prior to attempting to join, and attained several valuable certifications to make her a more specialized tool for ISIS. Wolfe likewise engaged in an elaborate scheme to travel that involved bringing his whole family, including two young children, raised money to travel, and forced his wife to watch radical videos to prepare her for the war. Both Warsame and Thavaraja actually succeeded in traveling abroad and joined terrorist organizations and both had leadership positions. Thavaraja used highly sophisticated means to advance the terroristic purpose for a prolonged period of time.

Mr. Farrokh's conduct can hardly be described as sophisticated or prolonged. As discussed previously, he is newcomer to extremist ideology and a relatively recent convert to Islam. More importantly, his radical ideals were shallow at best and represent a search for identity and purpose, and a reaction to recently ending a longstanding opiate addiction, rather than a deep-seated commitment to violence or jihadist goals. Like Conley and Wolfe, who received sentences of 60 and 82 months respectively, Mr. Farrokh was arrested at the Richmond airport before he was able to travel. Although he had shaved his beard and bought an airplane ticket, unlike Conley and Wolfe, he engaged in far less planning, all of which was lacking in sophistication. Also, unlike any of these four defendants, he did not engage in any particular preparation to participate in war. By all accounts was was a complete novice. Conversely, Warsame and Thavaraja, were far more steeped in radical ideology and were actually successful in their efforts to join a terrorist group, but received substantial downward variances. In the

final analysis, Mr. Farrokh's conduct is more akin to Wolfe and Conley, than Warsame and Thavaraja, and his punishment should reflect that similarity.

Consideration of the sentencing outcomes for these similarly situated defendants and the need to avoid unwarranted sentence disparities demonstrates a significant downward variance is warranted in this case. To that end, and because he is not in any way a terrorist, Mr. Farrokh requests that he be sentenced to a term of 63 months, which is the bottom end of the starting guideline range that would apply but for the terrorism enhancement pursuant to §3A1.4, and within the sentences imposed for the defendants most similarly situated, Conley and Wolfe.

### 6.    *United States v. Amin*, 1:15-cr-164 (E.D.Va. 2015).

The United States may suggest *United States v. Amin*, a case recently concluded in this district, is appropriate for comparison, but it is not. By the United State's own account, Mr. Amin was a uniquely sophisticated and influential ISIS recruiter with a long-standing online presence through which he prosthelytized and radicalized "untold numbers of people worldwide", (Doc. 15, at 2), and estimated his more than 7,000 messages reached a group "followers" numbering over 4,000. (Doc. 7, at 2). The United States' evidence showed Mr. Amin had been an active supporter of ISIS for an extended period and had built his online following by regularly providing scholarly support for ISIS and its violent practices and objectives, writing and circulating scholarly articles aimed at creating a "Dark Wallet" revenue stream to provide steady financial support for ISIS, and publishing extensively on a range of other subjects aimed at creating an infrastructure of radical ISIS recruitment. *Id.* at 3-4. The latter category included writings about creating an official ISIS website, advice to jihadists seeking to travel abroad to fight with ISIS, and "highly technical articles … detailing the use of security measures in online communications to include use of encryption and anonymity

software, tools, and techniques". *Id.* at 4. Finally, the United States proved Amin masterminded Reza Niknejad's *successful* travel to Syria to join ISIS by using his international contacts to facilitate his travel to Syria through a third country, providing logistical and tactical support to communicate and avoid detection, and taking him to the airport. *Id.* at 5.

In its sentencing memorandum, in which it asked the court to impose a sentence of 15 years, this United States Attorney argued:

> The defendant's offense is notable both for its scope, reaching untold numbers of people worldwide, and for its acute impact on Reza Nikenjad and his family. On the one hand, it is hard to measure the impact on worldwide security the defendant has had through the use of [his] online monikor. The only thing that is certain is that he was a prolific source for support, sophisticated advice, and facilitation, and facilitation of would-be ISIL members all over the world. On the other hand, it is hard to ignore the impact that the defendant's conduct has had on Reza Nikejad (sic) and his parents. This defendant *radicalized* Niknejad and set him on the path to violent jihad. This defendant connected Niknejad with other individuals traveling to Syria to join ISIL. This defendant secured a ride to the airport for Niknejad, provided a thumb drive with a letter and pictures to Niknejad's family on his behalf, and tried to hide Niknejad's plan to join ISIL, by giving a concocted story to investigators looking for Niknejad. There is no question that Niknejad is an adult, who made his own decisions. But there is also no question that this defendant was the single, driving force behind Niknejad's radicalization and desire to fight and die for ISIL.

> The defendant's conduct online and in person was well-considered, sophisticated, and calculated to provide support to ISIL, a group that the defendant well knew was engaged in atrocious violence and terror. These actions were meant to produce results – namely, the provision of soldiers to engage in violent jihad with ISIL. This conduct must be met with a stiff penalty because of its scope and the harm that the defendant caused, both to the immeasurable number of individuals whose stories will never be known, and to Reza Niknejad and his family, for whom this defendant has already written an unhappy ending.

(Doc. 15, at 2-3 (emphasis added).) For his elaborate criminal activity, Amin received a sentence of 136 months. (Doc. 20, at 2.)

In contrast, Mr. Farrokh's crime is defined not by its sophistication, but by the lack thereof. Essentially, Mr. Farrokh's codefendant, who was his chief radicalizer, put him in touch

with government agents who facilitated virtually every aspect of the crime and gave him direction on how to travel abroad. Although Mr. Farrokh did intend to join ISIS and purchased the ticket to travel abroad, these activities were actively encouraged by the confidential informants working on behalf of the United States. While Mr. Amin was indeed young, there was no disputing his level of competence in understanding and articulating jihadist ideology, crafting a compelling message to his adherents, his capacity to radicalize and otherwise encourage others into joining ISIS or adhering to the tenants of its terror, or his ability to coordinate travel. Likewise, Amin possessed a hight degree of advanced understanding of the internet and encryption that allowed him to circumvent authorities for an extended period. By any objective measure, Mr. Farrokh is far less culpable, radicalized, and or likely to re-offend.

### 7.    Conclusion.

Because the defendants in the most relevant comparison cases received sentences of between 60 and 108 months, and his offense is most similar to the crime committed by the defendant at the low end of that range, a sentence of 63 months is appropriate and would avoid creating unwarranted sentencing disparities.

## III.    IMPOSITION OF A FINE.

The Court is authorized to impose a fine in this case, under U.S.S.G. § 5K1.2, as a part of Mr. Farrokh's sentence. Mr. Farrokh requests that no fine be imposed by this Court because, as probation officer Nina Blanchard concluded that due to "his lack of financial resources, the defendant does not appear to have the means to pay a fine in this case." (Doc. 40, at ¶ 58).

## IV.    RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISONS.

After a sentence of imprisonment is imposed the BOP begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621).  The BOP retains

exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4) (A) & (B). Because Mr. Farrokh has previously been addicted to opiates and that addiction contributed to the crime and harmed his personal relationships, he respectfully requests that the Court recommend a facility as close to Northern Virginia that provides residential drug treatment for inmates with addictions and a history of substance abuse. Accordingly, if his security level qualifies him, Mr. Farrokh respectfully requests that the Court recommend that he be designated to one of the following institutions: (1) FPC Beckley (WV); (2) FPC Lewisburg (PA); (3) FPC McKean (PA); or (4) FCI, Butner (NC).

## V. COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Farrokh's reintegration and transition back to society upon completion of a sentence, the defense requests that the Court include in its order a recommendation that Mr. Farrokh eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law; preferably one that makes drug treatment available for its clients. The Second Chance Act (through 18 U.S.C. § 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they have demonstrated need for reintegration services. Mr. Farrokh, who became radicalized rapidly, will greatly benefit from the services available in a Residential Re-Entry Center. Such reintegration will be critical to address the issues that led to Mr. Farrokh's incarceration in the first place, and will be key his successful return to the community and reintegration into his family. Mr. Farrokh, therefore, respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

## CONCLUSION

For all these reasons, Mr. Farrokh respectfully requests that this Court impose a sentence of 63 months and no fine. Such a sentence is reasonable and just because it is a sufficient punishment but not greater than necessary. Mr. Farrokh also requests the Court include in its sentencing order a recommendation that Mr. Farrokh (1) be assigned to a specified facility that provides residential drug treatment, and (2) be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

Respectfully submitted,
Joseph Hassan Farrokh
By Counsel


_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 8th day of July, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gordon D. Kromberg
Dennis M. Fitzpatrick
Assistant United States Attorneys
Attorneys for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 837-8242
gordon.kromberg@usdoj.gov
dennis.fitzpatrick@usdoj.gov

_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com