```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,     )  Case 1:16-cr-00020
                                   )
 4                   Plaintiff,    )
                                   )
 5          v.                     )  Alexandria, Virginia
                                   )  July 15, 2016
 6   JOSEPH HASSAN FARROKH,        )  9:22 a.m.
                                   )
 7                   Defendant.    )
                                   )  Pages 1 - 39
 8

 9                      TRANSCRIPT OF SENTENCING

10           BEFORE THE HONORABLE ANTHONY J. TRENGA

11              UNITED STATES DISTRICT COURT JUDGE

12
     APPEARANCES:
13
     FOR THE PLAINTIFF:
14
          DENNIS M. FITZPATRICK, ESQUIRE
15        GORDON D. KROMBERG, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
16        2100 Jamieson Avenue
          Alexandria, Virginia  22314
17        (703) 299-3700

18   FOR THE DEFENDANT:

19        JOSEPH T. FLOOD, ESQUIRE
          THE LAW OFFICE OF JOSEPH T. FLOOD
20        10621 Jones Street, Suite 301-A
          Fairfax, Virginia  22030
21        (703) 691-8410

22   THE DEFENDANT, JOSEPH HASSAN FARROKH, IN PERSON

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1            THE CLERK:  Criminal Case 1:16-cr-20, *United*
2  *States of America v. Joseph Hassan Farrokh.*
3            Will counsel please identify themselves for
4  the record.
5            MR. FITZPATRICK:  Thank you.
6            Good morning, Your Honor.  Dennis Fitzpatrick
7  and Gordon Kromberg on behalf of the United States.
8            MR. FLOOD:  Joseph Flood on behalf of
9  Mr. Farrokh.
10           THE COURT:  All right.  We're here for
11 sentencing.
12           Mr. Flood, have you provided a copy of the
13 presentence report to Mr. Farrokh, and do you have any
14 objections?
15           MR. FLOOD:  I don't have any other
16 objections, Your Honor.
17           THE COURT:  Does the government have any
18 objections to the presentence report?
19           MR. FITZPATRICK:  No, Your Honor.
20           THE COURT:  Does the government want to be
21 heard on the sentencing factors?
22           MR. FITZPATRICK:  Yes, Your Honor.  Thank
23 you.
24           With respect to the sentencing factors, Your
25 Honor, as you can tell from the government's submission

1  in this case, the government views this as a

2  significant and very serious matter.

3         The defendant over the course of the entire

4  year of 2015 became increasingly radicalized by ISIL, a

5  notorious unmistakable violent terrorist organization.

6  Their motives, goals, aspirations cannot be ignored,

7  misinterpreted at all.  They seek to commit outrageous

8  acts of violence.  They promote that violence, and they

9  promote that violence to recruit like-minded

10  individuals.

11         The defendant throughout 2015 found that

12  organization appealing.  He found it so appealing that

13  he decided to abandon his life here, make contacts with

14  what he thought were people within that organization,

15  arrange for a trip for himself to Syria to join that

16  organization to become a fighter with that group.

17  Therefore, the nature and circumstances of this offense

18  are highly aggravated.

19         The defendant's conduct poses a significant

20  threat to the community.  That threat deserves a strong

21  message from the Court.

22         With respect to the defendant's conduct since

23  his arrest, the government is pleased with that.  We

24  should be pleased with that.  With respect to what

25  happens in the future, the government's position is

1   that's a long road.  The defendant is going to have a

2   long road of rehabilitation.

3           So, Your Honor, with respect to the 3553(a)

4   factors, it's largely driven by the circumstances of

5   the offense.

6           Your Honor, I want to address -- perhaps

7   once -- we can let Mr. Flood address the 3553(a)

8   factors.  I would like to address some of the medical

9   findings from his doctor.  Would you like me to do that

10  now?

11          THE COURT:  Yes.

12          MR. FITZPATRICK:  Judge, just very briefly on

13  that, with respect to the medical submissions provided

14  by Mr. Flood, the doctor is really speaking outside of

15  his lane.  He can't comment to a reasonable degree of

16  medical certainty on overrepresentation of criminal

17  history.  He's outside of his lane when he does that.

18          Frankly, Your Honor, he says that -- it must

19  be deliberate.  In his summary, Your Honor, on page 28

20  of Dr. Saathoff's summary, he says, "I have reached my

21  conclusions to the four questions with a reasonable

22  degree of certainty."

23          Now, Your Honor, he doesn't say to a

24  reasonable degree of medical certainty.  He doesn't say

25  to a reasonable degree of scientific certainty.  He

1  doesn't say to a reasonable degree of technical

2  certainty.  He doesn't say to a reasonable degree of

3  legal certainty because he can't.  He can't say it's a

4  medical certainty because it's not based in medical

5  fact.  It is simply his opinion.  It's his lay opinion

6  because it has no basis in medical fact.

7         Without being flippant, Your Honor -- and I

8  certainly don't mean to be flippant -- we could present

9  a letter from an electrician or a plumber who would say

10  his criminal history is not overrepresentative of his

11  conduct.  So that opinion, Your Honor, has no value.

12  Consequently, I think it undermines the reliability of

13  the report.

14         Further, Your Honor, there's one other

15  statement in the doctor's conclusion that I think must

16  be addressed:  "Compared to other individuals in their

17  twenties, Mr. Farrokh's risk state and risk status are

18  significantly decreased, and his risk of recidivism is

19  low."

20         Again, to be charitable to the doctor --

21  because I think he placed some effort into this --

22  that's an outrageous statement, that statement.  Every

23  year in July, August thousands of 20-year-olds flock to

24  this region for school, for internships, for graduate

25  programs, for jobs.  I would venture to say none or

1  maybe one of those thousands are harboring an interest

2  in joining ISIL.

3          So to say that compared to other individuals

4  in their twenties, Mr. Farrokh's risk state and risk

5  status are significantly decreased, that's an

6  outrageous statement.  There is no basis in fact.

7  There's no basis in logic.  There's no basis in common

8  sense for that statement.  In his very narrow class of

9  people, perhaps that's true.  But in that very narrow

10  class of people, those people who are enamored and who

11  found ISIL and their goals and ideology appealing,

12  that's a bad group.

13          So, Your Honor, I'd submit that

14  Dr. Saathoff's report is significantly flawed in its

15  conclusions.  We appreciate the effort.  The

16  conclusions are of no significance for this case.

17          So, Your Honor, with that in mind, I would

18  draw your attention to the *Ali Amin* case, 136 months.

19  This defendant is, in our view, more culpable than that

20  case, A, in his conduct.  Mr. Flood tries to draw a

21  distinction between recruiters and recruits.  I'm not

22  so sure how you do that.  In our view, the recruit, the

23  person who wants to go and join and fight and chop

24  heads and kill American soldiers as he stated during

25  the course of 2015, that person is more aggravated than

1   the recruiter.  The recruiter engages in bad conduct as

2   well, but the recruit is the one who wants to go and

3   act out.

4           So, Your Honor, we would point the Court to

5   that offense, ask for a sentence greater than 136

6   months, and I'll answer any of the Court's questions.

7           THE COURT:  All right.  Thank you.

8           Mr. Flood.

9           MR. FLOOD:  Thank you, Your Honor.

10          In our sentencing memorandum, we have asked

11  for the Court to impose a sentence of 63 months because

12  we think that sentence is the one that most accurately

13  and fairly reflects both his moral, legal culpability

14  and the sentencing factors that this Court must

15  consider.  Importantly, it is in line with the cases

16  that are truly similar to this conduct.

17          Mr. Fitzpatrick talks about this being a

18  highly aggravated offense.  Of the group of cases that

19  have been submitted to the Court -- I believe there are

20  eight -- I think there's only one, the *Conley* case from

21  Denver, where the defendant engaged in arguably less

22  aggravated conduct.  She got 60 months, and she was

23  arrested at the airport much like Mr. Farrokh.  But one

24  of the distinctions in that case was that she had been

25  preparing to go abroad and took special efforts to get

1  training and get special certification in advance of

2  that.  She had all intents and purposes of going

3  abroad.

4           There are two reasons why you could argue her

5  conduct was less aggravated, and it's because of her

6  age.  She was 19 at the time of the offense, and there

7  was at least some ambiguity as to whether she intended

8  to fight.  Because Mr. Farrokh's purpose was to join

9  this organization and fight against the Asaad regime,

10 there's at least an argument that she is less

11 aggravated.

12          But in terms of the vast majority of these

13 cases -- and they're starting to grow -- it's hard to

14 imagine someone who committed a less aggravated offense

15 and still be found guilty of this.

16          In this case, it's undisputed that his

17 radicalization happened very quickly.  Upon his arrest,

18 it dissipated very quickly.  It was quick in and quick

19 out, a very, very shallow commitment, which reflects

20 less ideology than you see in these other cases, like

21 *Amin*, *Warsame*, *Benkahla*, and more that this is an

22 outcropping of personal problems that we've discussed

23 at length.

24          Mr. Farrokh -- and the government hasn't

25 disputed this -- had very limited experience in the

understanding of jihad.  I've listened to the recordings of him talking to the confidential informants who posed as very learned in the Koran and the sort of scriptural basis for jihad.  Mr. Farrokh says exceedingly little because his understanding of this is exceptionally shallow.  His is probably, even including *Conley*, the least sophisticated of these attempts to go abroad and participate in terrorism, which also reflects less aggravation, not more aggravation.

There's no impact of his crime.  It's a horrible crime, and he represented -- on that day that he was arrested and the months leading up to that, he represented a risk, but no one was hurt.  He was not a recruiter.  Mr. Farrokh -- and I think this is really important and it's borne out by the cases -- he was actively recruited by his codefendant, who is smarter in terms of terrorism, more sophisticated, more learned in the principles of jihad, and he was radicalized by him.

The person who is capable of changing hearts and minds, like Mr. Amin, like all of these defendants who are getting higher sentences, represent a greater existential threat to our democracy and to our security than someone who is willing to pick up a rifle and

1   fight in a foreign country.

2         Prior to this -- and this is sort of

3   important compared to the other people -- he had no

4   online presence.  He wasn't blogging about this.  He

5   did not have an international web of connections like

6   his codefendant did, like Mr. Amin did.

7         I sat here last year and listened to the

8   government talk about Mr. Amin impacting some 4,000

9   followers and encouraging at least one person and

10  facilitating one person to go abroad.  That is a

11  greater threat than someone who is going to an airport.

12        He depended on his codefendant for all of the

13  contacts.  There was some talk last summer about going

14  abroad, but Mr. Farrokh lacked the capacity or ability

15  to do it himself.  He depended on his codefendant.

16        I'm not saying Mr. Elhassan is some sort of

17  sophisticated terrorist genius.  He's certainly more

18  advanced and more radicalized than Mr. Farrokh.  But it

19  was only through Elhassan that he was put in contact

20  with the people who appeared to be able to help him go

21  abroad.  He didn't have any of these contacts himself.

22  He did not initiate them.  He had exceedingly limited

23  knowledge of the ability to go abroad.  There's no

24  evidence that he was independently speaking with anyone

25  who could facilitate his travel.

1    He was arrested at the airport in January and

2 immediately or at the soonest possibility began

3 cooperating. He renounced this affiliation, renounced

4 ISIS, and quickly came to his senses. He admits that

5 this was sort of a religious zealotry gone awry. And

6 as soon as he was arrested, he started and continued to

7 do everything in his power to make this right,

8 including the hard emotional work of repairing

9 relationships with his family and addressing his drug

10 addiction.

11    His entire family is here today, including

12 his wife and mother-in-law. His two sisters came in

13 from out of town, and his parents are here. They

14 support him in this. This has been a painful process

15 for everyone, and Mr. Farrokh is doing the hard work

16 necessary to repair those relationships and deal with

17 his emotional problems and his substance abuse

18 problems.

19    Mr. Farrokh has exceedingly compelling

20 reasons that distinguish him from every other defendant

21 that we have talked about -- and I'll get to that in a

22 moment -- that distinguishes him based on his

23 character, the speed and certainty in which he

24 renounced this horrible organization, and the solidness

25 of his commitment to doing the right things in the eyes

1   of the law and in the eyes of this Court.

2           Mr. Fitzpatrick takes issues with some of the

3   findings of our expert, and I'll address those just

4   briefly.  I do think it's appropriate for an expert who

5   considers as one of the elements of their risk

6   assessment the person's prior criminal history, both in

7   terms of the actual behavior and convictions, and their

8   mental state, both their propensity towards violence

9   and a criminal mind-set, to assess whether or not this

10  person fits the profile of someone who is at a risk to

11  commit crimes in the future.  That is one of the

12  questions this Court has to answer.

13          I'm not saying this expert can replace its

14  judgment for the Court's, but having done an extensive

15  social history, a biosocial assessment of this

16  defendant, I think the expert is perfectly capable of

17  opining on whether or not a level VI and the

18  significant punishment that follows that accurately

19  represents both his criminal propensity and his

20  personal characteristics.  It clearly does not.

21          There's no real issue here of whether or not

22  the expert can opine about his risk of recidivism.

23  There's no scientific literature offered by the

24  government here to dispute that.  When you look at the

25  comparable cases that have been submitted to this

1  Court, other than *Conley*, there's no one in that group

2  who represents a lower risk of recidivism than

3  Mr. Farrokh.

4          So if I could turn to my request for a

5  downward departure, there are essentially three

6  elements of our request for a downward departure.   The

7  first is that he starts off as a category II, and we

8  believe that that is not an apt characterization of his

9  criminal history.   The two convictions on which that is

10  based in the PSI both arise from conduct that occurred

11  over 10 years ago.   At the time he began the activity

12  that led him to commit this offense, one was just a few

13  months short of being ten years old.

14          The commentary makes clear that where a

15  person had two minor misdemeanor convictions close to

16  10 years prior to the incident offense with no other

17  criminal convictions in between, that's an appropriate

18  time to depart.   So we disagree with her

19  characterization that you start at level II.   We think

20  that he should start at level I.

21          The other two factors are whether or not the

22  criminal history category VI overrepresents his actual

23  criminal history.   We think it does to a staggering

24  degree.   As I just noted, the only prior convictions

25  are two minor misdemeanors that he served no jail time

1    on that are now older than 10 years old.  One of them

2    is a year older and just came in under that 10-year

3    mark.  If it wasn't for that, he would be criminal

4    history category I.

5            His entire adult life Mr. Farrokh has been

6    gainfully employed.  As everyone recounts, he's been a

7    very hard worker.  Even in the throws of his drug

8    addiction when he was at his worst, he always made it

9    to work and was thought well of by his employers and

10   his coworkers.

11           He has no history of violence.  Again,

12   Mr. Fitzpatrick talks about this being a highly

13   aggravated case.  If you look at the comparable cases,

14   there's one individual who traveled abroad and bragged

15   about killing someone, and he was organizing a small

16   army to travel abroad.  He got a sentence less than

17   what the government is asking for here.

18           Mr. Farrokh has never possessed, used, or

19   owned firearms.  He's never received any weapons

20   training or military training.  Prior to this event --

21   which no one got hurt, and there wasn't actual

22   violence.  But it did represent a significant threat.

23   He did not act in an aggressive or a violent way.  It

24   was neither protracted, nor sophisticated in what he

25   did.

1        For all of those reasons, we think a downward

2   departure is appropriate because it overrepresents his

3   criminal history.

4        The Court can also grant a downward departure

5   where there is reliable information that the

6   defendant's criminal history category substantially

7   overrepresents the likelihood that he will commit

8   crimes in the future.

9        Setting the expert's opinion to the side for

10   a second, if you look at *Benkahla* and *Aref*, it's really

11   clear that those defendants who both received downward

12   departures of 180 months, okay, were way beyond what

13   Mr. Farrokh did in this case.   Their behavior was far

14   more protracted.   They were much more radicalized.

15        Aref committed 27 different crimes.   He was

16   raising money for a terrorist organization.   Benkahla

17   actually traveled abroad and then obstructed justice

18   for years, lied before a grand jury, perjured himself

19   on the stand in this courthouse, and was punished

20   appropriately.

21        But in both of those cases, the courts

22   recognized that when you looked at who they were before

23   the offense, they were not the type of terrorists that

24   the level VI punishment would be appropriate for.   They

25   both received downward departures.   They introduced

1    evidence of long-standing employment, ties to the

2    community, family support, and a lack of a criminal

3    history.

4           Using the language from the judge in

5    *Benkahla*, if *Benkahla* is the quintessential candidate

6    for a downward departure, it's hard to imagine anyone

7    less likely than Mr. Farrokh to commit a crime in the

8    future, any crime and, in particular, one that is

9    related to terrorism.

10          Dr. Saathoff goes through a very detailed

11   analysis of the myriad of factors that apply.  He only

12   finds a single factor that elevates Mr. Farrokh's

13   likelihood of recidivism, and that's his drug use.

14   That's a historical factor that Mr. Farrokh can't

15   change, and that slightly elevates it.

16          But compared to all other potential

17   recidivist -- I think that's the part that

18   Mr. Fitzpatrick is missing.  In the report,

19   Dr. Saathoff makes clear that he's comparing

20   Mr. Farrokh to other people who have committed similar

21   terrorist offenses.  And among that group, which is

22   probably a relatively high risk, he is a very low risk

23   of recidivism.  That is compelling, reliable

24   information that he is unlikely to ever reoffend.

25          So for all of those reasons, we think that

1  the starting point for considering the 3553 factors is

2  a sentencing range of 168 to 210.

3          Turning to our request for a variance, the

4  nature and consequences of this crime were potentially

5  severe.  No one got hurt.  It was essentially monitored

6  by the FBI from the get-go, but it was a very

7  dangerous, risky thing to do.  If he had succeeded,

8  probably he would have made it to the battlefield and

9  could have harmed someone.

10          As I said earlier, this was not deep-seated

11  radicalism.  This was not a deeply held ideology.  It

12  was something that was the outcrop of a personal

13  problem that he has begun to resolve.  He was quick in

14  and quick out.  He was a complete neophyte.  He was

15  inexperienced both in terms of the Koran, jihadism,

16  ISIS, the scriptural support for violence in defense of

17  the Muslim people, and ultimately, was a very shallow

18  commitment to radical extremism.

19          The crime in itself was very, very basic.  It

20  was not highly aggravated.  They drove from Woodbridge

21  to Richmond where he was promptly arrested at the

22  airport.  It was monitored by the FBI in its entirety.

23  He depended upon Elhassan to make connections with the

24  apparent -- not actual but the apparent radicalized

25  community.  In every regard, Mr. Farrokh was a

1    follower.

2         When you listen to the recordings of him

3    talking with the confidential informants, most of his

4    answers are monosyllabic or very, very short

5    affirmations.  He only talks about 18 percent of the

6    time.  When he does, it's almost always uh-huh, yes,

7    uh-huh, uh-huh, and praise to Allah.

8         The one time that he says anything of any

9    kind of magnitude or detail is when he's reciting

10   verbatim an oath that the confidential informants

11   insist that he recite in order to sort of cement their

12   bond, and he shows great reluctance to do that.  He's

13   concerned about it.  He's confused why that needs to

14   happen.  He ultimately goes along but in doing so, sort

15   of encapsulates who he is.

16        He is a passionate person who had emotional

17   problems that got him there, and he was following

18   through on that.  But it was a blindless following

19   because it was driven by sort of his new addiction at

20   that point, which was religion.  He had recovered from

21   drug use in the sense that he stopped using opiates,

22   but it wasn't a full recovery.  His addiction just

23   transferred into the newest thing, which was his

24   religion.

25        That's not to call into question the fact

1  that Mr. Farrokh is quite devout.  But the way his

2  piousness was manifesting itself was blemished by his

3  personal problems and not a reflection on what Islam

4  is, and Mr. Farrokh will talk about that.

5         The history and characteristics of this

6  defendant are, I think, compelling reasons to grant a

7  downward variance.  It's our submission -- and I won't

8  go into great detail -- that this is not the natural

9  sort of development of his personal problems, but it's

10 understandable how this happened.

11        Mr. Farrokh has gained great insight into his

12 behavior and the reasons he did this in the last six

13 months.  As I said earlier, this was not a deep

14 commitment to this organization.  It was not a deep

15 commitment to violence or jihadism.  It was the natural

16 expression of someone who has significant problems and

17 was being led by someone who they looked up to,

18 admired, and sort of filled an important place in their

19 life.

20        In every other regard other than those

21 personal problems, Mr. Farrokh is considered by the

22 people who know him, friends, family, coworkers, the

23 jail -- Mr. Fitzpatrick even sort of hints to this,

24 that he's actually a very good person.  He has very

25 good character.

1          He for the entirety of his life has been a
2    peaceful, gentle, family-oriented person.  He has no
3    history of violence, and he absolutely renounced ISIS
4    and expressed profound remorse for what he did to his
5    family and to his country.
6          I'll just touch on a few of the cases dealing
7    with the unwarranted sentencing disparities.  Conley,
8    as I noted, was a 19-year-old woman whose conduct
9    consisted of the identical behavior of Mr. Farrokh,
10   going to an airport in Denver.  Different than
11   Mr. Farrokh and arguably more aggravating is the fact
12   that she had spent approximately a year prior to that
13   preparing for the trip and getting special training to
14   be of great assistance on the battlefield.
15         After being arrested at the airport, she,
16   like Mr. Farrokh, promptly renounced ISIS, began
17   cooperating, and entered a guilty plea.  Her guideline
18   range was 168 to 210 months, and she was given a
19   downward departure, depending on how you calculate it,
20   of between 108 and 150 months or a downward variance.
21         Mr. Wolfe was arrested at an airport in
22   Texas.  Again, unlike Mr. Farrokh, he had engaged in
23   much more extensive planning and took the initiative on
24   his own.  I think what makes his case somewhat more
25   aggravating -- although I would say it's similar -- is

1  the fact that he was planning to take his wife and two

2  young children to Syria to support him in the battle.

3  So he did not just represent a threat to himself and

4  the people that he might hurt.  He was consciously

5  bringing family members who were going to be in peril.

6  He received a guideline variance of 180 months and was

7  sentenced to 82 months.

8          The *Warsame* case, which is from Minnesota and

9  is one of the defendants that prompted the district

10 court judge there to create a program, he received a

11 downward departure between 200 and 273 months.  He

12 actually traveled abroad.  There is no evidence that he

13 participated in killing anyone, but his plan was much

14 more developed than Mr. Farrokh.  He was successful in

15 it, and he actually participated in activities abroad.

16 His original sentencing range was higher than

17 Mr. Farrokh's, 292 to 365, but he received a sentence

18 of 92 months.  We believe that compared to him,

19 Mr. Farrokh is far less culpable.

20          The government relies on three cases.  They

21 all involve recruiters or organizers, the people who

22 are changing hearts and minds and convincing people to

23 travel abroad.  They're all people who are more

24 sophisticated both in their understanding and intellect

25 and in the planning that went into the crimes.  They're

1  all far more radicalized than Mr. Farrokh.  They all

2  engage in a more elaborate scheme and planning.  Their

3  behavior was far more impactful.

4          We've talked a little bit about Mr. Amin, and

5  I'll just say a couple of more points.  I represented

6  Mr. Amin and argued in this court for a lesser sentence

7  than he received because of his youth.  But the truth

8  is, as the government pointed out in that case, he had

9  been online for a long period of time and was

10 communicating with people all over the world and

11 radicalizing multiple individuals.  The government

12 suggested it could be as many as 4,000, but there were

13 clearly two people that he had a direct and acute

14 impact on, one who eventually traveled abroad with

15 Mr. Amin's assistance.

16          His sophisticated plan involved connecting

17 this person with people abroad, much like Mr. Elhassan

18 was doing in this case.  As I understand it, Reza

19 Niknejad in that case didn't know anyone abroad, and he

20 depended upon Mr. Amin to do that.

21          The *Saadeh* case, far more elaborate.  He was

22 creating an army in the United States, engaging in all

23 kinds of behavior to avoid detection, and did not

24 engage in the kind of behavior that Mr. Farrokh did

25 immediately after.

1          The *Nguyen* case, there's no comparison.  He

2    did go abroad.  He killed people, and he was ready to

3    be a leader.

4          All of these people in one way or another

5    were leaders and were punished appropriately.

6          In the supplement that we filed yesterday,

7    the people who are actively involved in recruiting,

8    based on the comparison cases, are sentenced at about

9    80 months more than their recruit.  In this case, we

10   think that that's an appropriate comparison to these

11   cases but also Mr. Farrokh to his codefendant.

12         For all of those reasons, we think the cases

13   the government relies upon are inapplicable and should

14   not be considered.

15         We've asked in our sentencing memo, Your

16   Honor, that the Court consider making a specific

17   recommendation of a facility to send Mr. Farrokh.

18         Through this process, it hasn't been

19   necessarily easy, and having spent a long time working

20   with people recovering from addiction, it never is.

21   But Mr. Farrokh is at a place where he acknowledges and

22   welcomes residential drug treatment.  That would be

23   highly beneficial for him not only to address his

24   problems but to provide some sense of security and

25   certainty about his behavior in the future.

1          We've identified four different institutions

2    that are in the general area that we could ask the

3    Court to send him to.  One is in Beckley, West

4    Virginia; Lewisburg, Pennsylvania; and Butner.

5          It's hard to imagine someone less culpable

6    than Mr. Farrokh who is still guilty of this offense.

7    He is the most appropriate candidate for a significant

8    downward departure and variance due to his personal

9    characteristics, extraordinary acceptance of

10   responsibility, exceedingly low risk of recidivism, and

11   his willingness to assist and cooperate and address his

12   personal problems.

13         For all of those reasons, we believe a

14   sentence of 63 months is the most appropriate

15   punishment in this case, Your Honor.

16              THE COURT:  All right.

17              MR. FLOOD:  Thank you, Your Honor.

18              THE COURT:  Thank you.

19              MR. FITZPATRICK:  Can I make a few responses?

20              THE COURT:  All right.

21              MR. FITZPATRICK:  Thank you very much, Your

22   Honor.

23         On the question of potential recidivism and

24   culpability, I think that there's a false assumption

25   that counsel and the doctor make in that they're going

1  from the group of people who are the offenders.  That's
2  what they say now.  It's not what the report says.  The
3  report says of all the people in their twenties, he has
4  a low risk of recidivism.  As I stated before, that's
5  just patently false.
6          Even within the small narrow group, you can't
7  make subtle distinctions as counsel is trying to make.
8  The defendant by his own conduct and his own words
9  placed himself in this narrow category of violent
10 offenders.
11         The defendant sought to travel in January of
12 this year.  This was after San Bernardino.  He places
13 himself in the category of San Bernardino, of Orlando,
14 of Boston, of Fort Hood, of Paris, and perhaps with
15 Nice.  We don't know yet.  Very likely that will be
16 inspired by ISIL.  We don't know yet.  He places
17 himself by his own conduct in that category.  So the
18 assumption that counsel and the doctor make that he's a
19 low risk of recidivism because of his unsophisticated
20 nature is just not apposite in this case.
21         With respect to -- and you know, I can make
22 the same argument with respect to his relative
23 culpability.  That's why we said in our position papers
24 that drawing fine distinctions between these cases are
25 difficult to make in comparisons and difficulties

1   because it's such a unique and violent category of

2   cases.

3          With respect to this defendant, the

4   government believes in individualized sentencing.  The

5   defense always is promoting that in terms of how we

6   should sentence offenders.  The government doesn't run

7   away with that, but the fact of the matter is

8   individually, this defendant placed himself in a narrow

9   category of violent offenders.  There's a message that

10  needs to be sent to the community.

11         With respect to comparisons to other cases

12  around the country, it's fair argument by Mr. Flood.

13  We don't dispute that.

14         However, I would point out to the Court that

15  there is -- I would submit to the Court respectfully:

16  There is a responsibility by this Court to consider our

17  community, the Eastern District of Virginia, and where

18  we're situated.  It's a highly populated environment,

19  different from, you know, out in Minnesota or more

20  rural aspects of Texas.  It's a highly populated area,

21  a target rich environment around here.  Your Honor's

22  sentence will be most felt and recognized within this

23  community, within Northern Virginia and the

24  Metropolitan D.C. area.

25         Issues of general deterrence are paramount in

1   this case.  So we would ask the Court for a significant

2   sentence to send the appropriate message.

3         Now, with respect to Mr. Flood's comments

4   about, you know, the defendant's conduct postarrest, I

5   will double down on that.  He has been good.  We're

6   confident in that.  We hope to be before you again

7   saying even more positive things.  But for today, the

8   issue is this defendant's history and this defendant's

9   conduct throughout 2015 and an appropriate context of

10  who he was joining and what violent conduct they were

11  committing.  With respect to that, Your Honor, we feel

12  that a sentence, again, in excess of what Mr. Amin

13  received is appropriate.

14        The age disparity there is significant.  The

15  courts are clear that juvenile offenders are less

16  culpable, that their sense of responsibility is less

17  developed.  This defendant, when he undertook his

18  conduct, was 28 years old.  He was a mature man.  He

19  wasn't the 22-year-old or the 23-year-old coming to

20  D.C. to get an internship, to get a job.  His views and

21  his place in the world, if not already solidified, were

22  well on the way to being solidified.  Yet, he made a

23  choice, and that choice was to go to Syria to fight

24  with ISIL.  That was a bad choice.

25        THE COURT:  Mr. Flood, I'll let you respond

1   to any of that.

2          MR. FLOOD:  Just two very brief points.  The

3   first is it can't be any clearer in Dr. Saathoff's

4   report the group of people that he is considering in

5   his comparison and analysis of the risk factors.  Under

6   the heading Factors Relevant to Terrorist Violence and

7   Risk of Re-Radicalization, he says there are ten

8   factors that are associated with recidivism.

9          Recidivism means the person has already

10  committed an offense and the risk that he'll reoffend

11  towards terrorism.  That's the question.  That's the

12  reason this Court appointed Dr. Saathoff, and that's

13  his analysis.  It's focused on comparing Mr. Farrokh to

14  other people who have committed terrorism-related

15  crimes and the risk of recidivism.  Compared to that

16  group, not the intern who is clerking for this Court

17  this summer or going out and doing something, it's him

18  compared to other people who have committed like

19  offenses.

20         The last thing Mr. Fitzpatrick got into was

21  all of these questions about domestic terrorism and

22  hinting sort of in a veiled way that Mr. Farrokh

23  represented a threat to domestic targets.  So San

24  Bernardino has no application.  None of these domestic

25  crimes -- because Mr. Farrokh throughout his

1  conversations with the confidential informants

2  absolutely renounced domestic terrorism, said he would

3  never do that.  That has never been on the table, and

4  it's being raised for the first time.  There was never

5  a discussion about targeting anyone in the United

6  States.  He was always envisioning himself as a soldier

7  in a cause that I don't agree with but one he believed

8  in at that time.  Okay.  There wasn't going to be any

9  activity in the United States.  To imply otherwise, I

10  think, is a little bit unfair at this late date.  He

11  renounced it then.  He renounces it now.  No one in the

12  United States was ever at risk because of what

13  Mr. Farrokh was doing.

14          Thank you.

15          THE COURT:  Thank you.

16          Mr. Farrokh, you have the opportunity to

17  address the Court before it imposes sentence.

18          THE DEFENDANT:  Thank you, Your Honor.

19          I have made a lot of poor choices in my life

20  but none as bad as trying to travel to Syria to join an

21  extreme and violent organization.  I deeply regret

22  doing that, and I want to make clear that I

23  unequivocally renounce ISIS and its sick ideology that

24  it uses to indoctrinate people into committing

25  atrocities in the name of God.

1           When I see the crimes that ISIS commits on a

2    daily basis, I'm disgusted by it.  They are crimes

3    against humanity, and in no way do they represent the

4    peaceful religion of Islam.  ISIS twists Islam to

5    radicalize and recruit people who are vulnerable and

6    searching for meaning, who then willingly sacrifice

7    what is really important for a lie.

8           The crime I committed is a result of great

9    emotional pain and unresolved personal problems that

10   I'm still figuring out.  It is a result of a lot of

11   shame, anger, and particularly my past substance abuse

12   which I never fully addressed and which left me feeling

13   lost and purposeless.

14          Until recently I had never confronted these

15   problems.  By failing to address these problems, I

16   became susceptible to a radicalized message that seemed

17   to fit with my desire to have a purpose and become a

18   part of something important.  I don't say that to make

19   excuses.  There is no excuse for committing a crime,

20   much less a terrorist act.  Even worse for me,

21   believing what I was doing was pleasing to God.

22          Since my arrest, I have been doing little

23   else other than examining my soul and repairing my

24   relationship with my wife and family.  I know I've

25   caused them a lot of pain.  I say that not just by

1  committing this offense but by some bad choices I made

2  over the years.  I value you my family very much, and I

3  know the choices I have made have had devastating

4  effects on them and on myself.

5          My wife is due to give birth to our son at

6  the end of this month, and I mourn the fact that I will

7  not be there to share this moment, this most sacred of

8  moments with her and our new son.  But I have dedicated

9  myself to be the best father, husband, and son that I

10  can be.

11          Lately I have been consciously making choices

12  within myself and growing as a human being.  I am

13  committed to continue to grow and seek out the

14  treatment I need for the problems which led me to

15  commit this crime.  I've been growing in my faith and

16  awareness.  Now I'm more equipped to make healthy life

17  decisions.  At the time of my arrest, I was not

18  equipped.  I am dedicated to acquiring the tools I need

19  in the future to continue to make healthy choices in my

20  life, especially for my wife and unborn son.

21          I'm very sorry for what I did, and I deeply

22  regret my crime.  In no way do I want to be associated

23  with ISIS or its sick ideology.  I absolutely condemn

24  them and their horrific crimes.  I am deeply remorseful

25  for what I did, and I can say with certainty that I

1  will never return to ISIS or its sick way of thinking,

2  nor would I make other disastrous or extreme choices in

3  my life because I have gained insight now.  I'm much

4  better prepared to make healthy life decisions.  In the

5  future, I'm committed to becoming a better person and

6  intend to make healthy life choices for myself, my

7  family, and my future.

8          Thank you.

9          THE COURT:  Have a seat.

10         This matter is before the Court for

11 sentencing in the case of *United States v. Joseph*

12 *Hassan Farrokh* who has been convicted of conspiracy to

13 provide and attempt to provide material support to a

14 foreign terrorist organization, in violation of

15 Title 18, United States Code, Section 2339B, which is a

16 Class C felony punishable by a term of imprisonment up

17 to 20 years, a fine of up to $250,000, a life term of

18 supervised release, and a $100 special assessment.

19         This 28-year-old defendant attempted to join

20 ISIS forces in Syria.  He was arrested on January 19,

21 2016, and on March 18, 2016, he waived indictment and

22 entered a plea, pursuant to a plea agreement, to a

23 criminal information charging conspiracy to provide and

24 attempt to provide material support to a foreign

25 terrorism organization.  He's been in custody since his

1  arrest.

2          The Court has reviewed the sentencing

3  guidelines and how they pertain to this defendant and

4  his offense.

5          The Court has considered the defendant's

6  objection to the category VI criminal history.  The

7  Court has considered that objection, and the issue is

8  whether category VI criminal history, which is the

9  highest history, overrepresents the seriousness of his

10 prior criminal history, which is at a history level II.

11         The Court concludes, based on all the

12 circumstances, that a criminal history level VI does

13 overrepresent the seriousness of his prior criminal

14 history; therefore, the Court will calculate the

15 guidelines based on a criminal history II.

16         Based on that ruling, the Court calculates

17 the guideline sentence as follows:  The base level is

18 26 appropriately increased by 12 levels, since the

19 offense involved or was intended to promote the federal

20 crime of terrorism, resulting in a base offense level

21 of 38.  The defendant has accepted responsibility and,

22 therefore, is entitled to a 2-level reduction.  The

23 government has moved for an additional 1 level.  Based

24 on that acceptance, which the Court grants, resulting

25 in an overall offense level of 35.

1          The guideline sentence for offense level 35,

2    criminal history II is 188 to 235 months.   Probation is

3    not authorized under the guidelines; although, it is

4    authorized under the statute.   Supervised release is

5    recommended of 1 to 3 years, a fine of $20,000 to

6    $200,000 with a special assessment of $100.

7          The Court has also reviewed the sentencing

8    factors in light of all the information available to

9    the Court.

10          With respect to the nature and serious of the

11   offense, based on the statement of facts and

12   uncontested facts in the presentence report, beginning

13   around August 2015 and continuing until January 15,

14   2016, the defendant conspired with others to provide

15   material support to a designated terrorist

16   organization, namely, the Islamic State in Iraq and the

17   Levant, also known as ISIS or ISIL.

18          In particular, the defendant attempted to

19   travel to Syria to join and fight at the direction of

20   ISIL.   In order to conceal their plans, the defendant

21   and his coconspirator, Defendant Mahmoud Amin Elhassan,

22   communicated in a manner that could not be detected by

23   law enforcement during which their nearly daily

24   communications in the latter half of 2015 spoke about

25   ISIL and violent jihad and engaged in other activities

1  prefatory to traveling to join ISIS.

2         Towards that end, he quit his job, traveled

3  to Richmond, Virginia, on January 15, 2016, in order to

4  fly from Richmond International Airport to Jordan.  He

5  was arrested at the airport.

6         The defendant is a United States citizen with

7  a relatively minor criminal history.  He has had mental

8  health counseling over the years; although, he has

9  never been involved in any therapy or diagnosed with

10  any mental health disorder.  He has a significant

11  history of substance abuse, high school level of

12  education with some college, and has been employed

13  consistently over the years with good performance.

14         Against this background, the Court has

15  considered the guideline sentence and the extent to

16  which it reflects an appropriate sentence with respect

17  to the sentencing objectives.  In that regard, the

18  Court has considered centrally what sentence is

19  necessary to adequately protect the public, not only in

20  terms of general deterrence with respect to individuals

21  who would engage in similar conduct but also this

22  particular defendant.

23         With respect to this particular defendant,

24  the Court has considered in detail the information

25  available to the Court for the purposes of assessing

1  future dangerousness, which is inherently a difficult

2  and not easy assessment.   There is evidence in this

3  case pointing in a number of different directions.

4        First, the Court must consider the fact that

5  this defendant in preparation for his travels

6  subscribed to the philosophy and objectives of what by

7  January 2016 were well-known objectives of an unbridled

8  viciousness and cruelty.   The Court can't ignore what

9  that attraction reflects as to someone's underlying

10  disposition.

11        The Court has also considered within that

12  context the defendant's activities prefatory to his

13  attempts to leave the country; the extent of any

14  activities to enlist, recruit, or radicalize others;

15  his declared intentions and objectives before his

16  arrest; and also the context within which those

17  statements were made.

18        Overall, the Court has attempted to assess

19  this particular defendant's overall commitment to the

20  radical terrorist philosophy that caused him to engage

21  in his offense.   In that connection, the Court has

22  considered his acceptance of responsibility, his

23  willingness to cooperate, and also his current stated

24  beliefs and attitudes with respect to ISIS and his

25  renouncement of its philosophy.

1          The Court has also considered the

2   professional assessments of the defendant by the

3   psychologist whose reports have been submitted.

4          The Court has also considered many letters

5   that it has received from family and friends who speak

6   to this particular defendant's characteristics and

7   talents, also the changes that he has faced.  In that

8   regard, the Court has considered the family history

9   that's been submitted to the Court, the mental health

10  issues that are associated with that history, the

11  defendant's substance abuse, and the extent to which

12  that use may have affected his conduct.

13         The Court has also considered the defendant's

14  age, his age upon release under any particular

15  sentence, his need for rehabilitative services, and

16  also, importantly, the extent to which the sentencing

17  objectives, in particular the public safety, can be

18  adequately addressed through supervised release

19  following any period of incarceration.

20         Based on all the information available to the

21  Court, the Court is in a position to impose sentence at

22  this time.

23         Mr. Farrokh, would you come to the podium,

24  please.

25         Mr. Farrokh, it will be the sentence of this

1    Court that you be committed to the Bureau of Prisons

2    for a period of 102 months, following which you'll be

3    placed on supervised release for a period of 10 years

4    under which you'll be subject to the standard terms and

5    conditions, including, in addition, the special

6    conditions that you have no contact with any

7    individuals actively involved in any terrorist

8    activities or whom you know has any past or current

9    ties to terrorism.  You'll not use or possesses a

10   computer without prior approval of probation.  You'll

11   engage in mental health counseling and substance abuse

12   counseling as directed by the probation office.

13          The Court will recommend that you be

14   considered for and, if appropriate, participate in the

15   intensive drug therapy program.

16          The Court will also recommend that you be

17   considered for and, if appropriate, participate in the

18   reentry programs available to you.

19          The Court will also recommend that you be

20   considered for and, if appropriate, assigned to the

21   facilities either at Beckley, Lewisburg, McKean, or

22   Butner.

23          The Court will not impose a fine.  The Court

24   will impose a $100 special assessment.

25          That will be the sentence of the Court.

1              Is there anything further?

2              MR. FITZPATRICK:  No, Your Honor.  Thank you.

3              THE COURT:  All right.  Thank you.

4              Counsel is excused.  The defendant is

5 remanded.

6              The Court will take a recess.

7           -----------------------------------
                      Time:  10:13 a.m.
8

9

10

11

12

13

14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
   accurate transcription of my stenographic notes.
23

24
                              /s/
25                   _____
                     Rhonda F. Montgomery, CCR, RPR